IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ERNEST LEE VADEN,

    Petitioner,                     No. CIV S-06-1733 JAM GGH P

    vs.

D.L. RUNNELS, Warden,

    Respondent.                 ORDER

_____/

*Introduction and Summary*

        Petitioner has requested an evidentiary hearing to prove his allegations of ineffective assistance of counsel with respect to his assertion that counsel should have called witnesses to back up his contentions that he had no motive to aid and abet the attempted murders of two juveniles. Petitioner further asserts that the witnesses might well have buttressed his defense theory that he was simply an unwilling, unknowing chauffeur for the perpetrator. For the reasons set forth below, the motion for evidentiary hearing is denied without prejudice.

*Facts*

        The request for evidentiary hearing, and especially the prejudice analysis required for an ineffective assistance claim, require a full detailing of the facts. Those facts set forth by the California Court of Appeal on affirming the verdict satisfy this requirement.

1

On the night of March 28, 2001,FN3 seventeen-year-old A.B. was at home in Vallejo with his friend D.R., who was fifteen years old. A.B. received a page and intended to walk to a pay telephone in order to return the call, as the home telephone was disconnected. As they left the house, they saw appellant Ernest Lee Vaden-an acquaintance of A.B.'s mother-outside sharing a beer. Vaden was with another man, Theodore Stith. A.B. asked if he could borrow Vaden's cell phone. Vaden agreed and led A.B. to his car where the cell phone was.

FN3. All dates refer to the 2001 calendar year unless otherwise indicated.

All four of them walked over to where Vaden's Nissan Maxima was parked and got in the car. Vaden sat in the driver's seat, Stith sat behind him, A.B. was in the front passenger seat and D.R. sat in the back seat behind A.B. Vaden said that he had an errand to run while A.B. returned his telephone call. No one objected to riding along with him. Stith asked Vaden to take him to American Canyon to see a girl.FN4

FN4. This was D.R.'s testimony. A.B. did not recall hearing Stith say this.

Once the telephone call was completed, A.B. noticed that the car was on the freeway heading out of Vallejo. Suddenly, Stith loudly accused A.B. of helping someone burglarize Vaden's home. Stith pulled out a silver semiautomatic pistol and pointed it at A.B. Vaden-although less hostile than Stith-encouraged these accusations. Vaden said "If you don't ... tell me who did it, this [is] going to turn into the shit you see on [sic ] the movies."He seemed more upset with the person who had arranged for A.B. to burglarize his home than with A.B. A.B. knew that Vaden's house had been burglarized, but he denied being involved in the crime.

The young men wanted to get out of the car, but there was no chance to do so-they were moving too fast on the freeway. On Stith's command, D.R. emptied his pockets and removed most of his clothing. Stith stated his intention to shoot A.B. Vaden drove off the freeway onto a dark country road FN5 and parked the car. Stith ordered D.R. to remove the last of his clothing. He ordered A . B. to undress, too, ripping the young man's shirt off when he thought A.B. was taking too long to comply. Naked, A.B. and D.R. squatted on the ground as they were ordered to do.

FN5. This road was later identified as Highway 12 outside of Suisun in Solano County.

Vaden continued to question A.B. about the burglary. Vaden said "Why don't you just tell us[?]""Save me a lot of trouble.""We know you did it...." "Just ... say who sent you and we can end this."When Stith seemed to believe A.B.'s denials of involvement and wanted to call things off, Vaden refused. "[N]o, ... it's too far gone. This has to be done," he told his companion. He told Stith: "You shoot him, and then I'm going to shoot the other one."Vaden said to A.B.: "I'm gonna count to three, and then if you don't tell me, you are gonna die."Stith wrapped the barrel of the gun in D.R.'s tee-shirt and pointed it in A.B.'s face.

*2   Vaden stood nearby in the road, acting as lookout. As VadenFN6 counted, Stith shot A.B. in his left eye. D.R. got up and ran when he saw his friend get shot. He fell into a creek and hid in some nearby bushes. He could hear Vaden and

Stith splashing in the water asking where he went. They left after a minute or two. D.R. waited another 15 or 30 minutes, then headed back toward the freeway. Naked along the freeway, he flagged down a truck driver and told him that A.B. had gotten shot. The driver called the police.

FN6. This was A.B.'s testimony. D.R. told the jury that Stith did the counting, but Vaden ordered him to do so.

Meanwhile, A.B. lay on the ground for some time, thinking only of his pain. After a while, he realized that he was alone. A.B. ran up a hill and hid in some bushes. He heard Vaden, who sounded upset, return to the area saying "We gotta find him." A.B. remained in hiding for about five minutes, at which time he saw the Nissan drive away. He walked about three-quarters of a mile down the road where he found a call box. The police located A.B. standing at a freeway call box. He was naked, muddy, very upset, bleeding from one eye, and shivering.

Vaden was arrested the following day. During a prearrest stakeout of Vaden's apartment, police observed Stith visit the apartment complex while they waited for Vaden. Vaden smelled of alcohol when he was questioned by police, who suggested that Stith might have been the shooter. Vaden denied any involvement- he told police that he had been out of the area that night and had not seen Stith. On April 2, Vaden was again interviewed by police.

\*\*\*

At trial, D.R. identified Vaden as the driver of the car FN9 and told the jury that Stith had threatened to stab and to shoot A.B. He testified that Stith hit A.B. with the gun while the men kept asking "Who did it?" Vaden pulled the car over after Stith told Vaden to do so and advised the driver to lean forward so he would not be spattered with blood when Stith shot A.B. Vaden's brother testified that he saw Vaden asleep in his car about 7:00 a.m. on the morning after the incident. Vaden smelled strongly of alcohol at that time.

FN9. In a pretrial photographic lineup, D.R. chose Vaden as the person who looked most like the driver, but was not completely certain of his identification.

Vaden testified in his own defense. He told the jury that his home had been burglarized on March 23 and he asked around his neighborhood about who might have done it. He was angry about the theft of about $7,000 worth of his property. On March 27, an individual-not A.B. or D.R.-showed him some of his stolen goods, then "jumped" him, beating him up and breaking a window in his girlfriend's car. He had the car windows repaired later that day.

Vaden testified that on March 28, he had been intoxicated. He went to A.B.'s house to buy marijuana. Stith was there, too, drinking beer. He asked A.B. if he could purchase some marijuana from him. A.B. told him that his supply was running low and he needed a ride to acquire more. Vaden agreed to drive him. Stith and D.R. came along. Vaden told the jury that Stith pulled out a gun and hit A.B. with it. Stith wanted to know who had taken his drugs. His actions frightened Vaden, who was also concerned that his girlfriend's car would get blood-stained. Stith told him to keep driving and he did as he was told. He testified that Stith said to A.B., "You know you did it." When Stith told Vaden to pull over off Highway 12, he did so.

3

> Stith threatened to kill both A.B. and D.R., but Vaden tried to stop him. They struggled over the gun and it went off. Vaden ran from Stith, who followed him, threatening to kill him, too. When the two men eventually returned to the car, Stith gave Vaden the keys and told him to drive. Stith tossed the gun and some clothing out of the car as they drove away. Vaden dropped Stith off at A.B.'s house, then continued drinking. He woke up at his brother's house. He denied threatening either of the victims or of being partnered with Stith. Stith was trying to get his drugs, not Vaden's stolen property.
>
> Vaden admitted that he had suffered prior felony convictions for robbery and sale of narcotics. (See § 211; Health & Saf.Code, § 11352.) His credibility was further impeached when he admitted that he had failed to tell police that Stith had threatened him, choosing instead to lie about what happened on the night of March 28.

People v. Vaden, 2003 WL 22977662 (Cal. App. 2003).

It is of interest that defendant Stith was tried at a later time in his own case. The evidence received in that case was entirely consistent with the prosecution's evidence in this case. People v Stith, 2003 WL 22977659 (2003).

*Discussion*

Standards for an Evidentiary Hearing

The availability of evidentiary hearings in AEDPA habeas cases has contracted somewhat. The Supreme Court has recently opined on the standards for granting an evidentiary hearing in Schriro v. Landrigan, __U.S.__, 127 S. Ct. 1933, 1939-1940 (2007), reversing Landrigan v. Schriro, 441 F.3d 638, 650 (9th Cir. 2006) (en banc).

Schriro first described the familiar test for granting an evidentiary hearing: that if the factual allegations were to be proved, petitioner would be entitled to relief. See Alberni v. McDaniel, 458 F.3d 860, 873 (9th Cir. 2006).[1] However, in determining whether relief could be

---

[1] The Ninth Circuit in Landrigan had reduced the test even further – "[w]e conclude Landrigan has alleged facts that, if demonstrated to be true, present a *colorable* claim that he received ineffective assistance of counsel..... Id at 650 (emphasis added). Thus, district courts were to hold evidentiary hearings not only in cases where the facts, if proven, would entitle the petitioner to relief, but in any case where the petitioner had "surpassed the relatively 'low bar' of alleging a colorable claim for relief." Id. Under such a test, evidentiary hearings would be required in nearly every habeas case presented to federal court in which ineffective assistance or

4

granted, the federal court must apply the AEDPA deferential standards to legal and factual questions necessarily reached by the state courts which might obviate the need for an evidentiary hearing. Schiro, 127 S. Ct. At 1939-40. Thus, for example, if the reasons for counsel's actions were at issue, but under deferential standards, the court could not find prejudice, no evidentiary hearing would be necessary. Similarly, if the state court had made factual findings on the issue at bar, no evidentiary hearing could be held unless petitioner's proffer would constitute clear and convincing evidence. Importantly, petitioner must have attempted to have developed in the state courts the facts he desires to present in federal court. Id. at footnote 1. In addition, if the record refuted the applicant's allegations, i.e., petitioner was making allegations at odds with the established facts of the record, he would not be permitted an evidentiary hearing unless such new facts would clearly and convincingly rebut the record. Generally phrased allegations, or the failure to submit a proffer of available, specific proof will not clearly and convincingly rebut the record.

Of course, if a lower state court is the court which issued a reasoned decision, the federal courts look through silent denials and assume the reasoning of the lower court is the reasoning of all courts. Medley v. Runnels, 506 F.3d 857, 862-863 (9th Cir. 2007).

The Superior Court's Determination

On the face of the petition, petitioner sets forth the anticipated testimony of witnesses who would all testify to the fact, in one form or another, that by the day of the attempted murder, petitioner already knew that Rickey Alexander, aka "Thumper," was involved in the burglary of petitioner's home and theft of equipment; moreover, some witnesses would testify to the fact that the victims were involved with drug dealing and inferentially involved with Stith in drug dealing.

Witness McCarver would testify that prior to the attempted murders, petitioner telephonically told him that Alexander and his associates were responsible for the burglary of

---

some other extra-record claim was made.

petitioner's home. Taylor would testify similarly as well as to collateral impeachment of one of the victims. Whitefield would testify that *he* told petitioner who burglarized petitioner's house. Taggert would have testified that he personally accompanied petitioner to Alexander's house, the day before the attempted murders, where petitioner accused Alexander of burglarizing his place, and received in return a beating by Alexander and his cousin for such allegations. Taggert would testify as well that Alexander attempted to sell him a keyboard which had come from petitioner's residence. Perry would have testified that the victims were indeed involved in selling drugs which would have corroborated petitioner's testimony that Stith and the victims were in a disagreement about a drug debt. Petitioner would have produced two other witnesses with cumulative information to the above.

The court is skeptical why this supposed testimony was not proffered in the form of declarations of the witnesses involved after all these years, and observes as well that all of the witnesses had friendly connections to petitioner. Moreover, the court has no declaration, or assertion for that matter, that petitioner told his counsel of the availability of these witnesses at the time of trial. Petitioner's assertions to the Superior Court and herein have the smell of post-hoc desperation.

As the parties recognize, neither the Court of Appeal nor the California Supreme Court issued explained decisions. Therefore, the decision to be reviewed for AEDPA purposes is that of the Superior Court. After a recitation of the standards for satisfying a claim of ineffective assistance of counsel, the Superior Court denied the petition on two grounds:

> [1] Petitioner presents no evidence, by affidavit, declaration or other means, demonstrating what counsel knew at the time of trial and the reasons for counsel's tactical choices.
>
> [2] Furthermore, it is evident that counsel's omissions did not involve critical issues and can be explained as a reasonable tactical decision. Based on Petitioner's descriptions of the testimony that would have been given by the witnesses that counsel failed to call, much of their testimony would have been inadmissible hearsay. The witnesses did not have first hand knowledge of the criminal act and most of their testimonies would have relied on what Petitioner told them at some earlier date. In addition, much of the testimony was irrelevant,

> dealing with possible minor inconsistencies in the prosecution's case...rather than the substantive elements of the charged crimes.

Respondent's Exhibit 10 (lodged filings) at 7.

There are, as petitioner notes, problems with the Superior Court's reasoning with respect to reason 2. Petitioner's asserted lack of motive to harm the victims was the lynchpin of the defense – the reluctant, unknowing chauffeur. The less likely that petitioner needed information in order to seek revenge upon the person(s) responsible for the burglary, the more likely that he did not intend to harm the victims. Assuming their credibility, many of the witnesses testified to admissible, prior consistent statements of petitioner; Whitefield's statement that he told petitioner who was responsible for the burglary is not hearsay at all[2], and is very relevant [to petitioner's defense]. Taggart's testimony was, of course, not hearsay as he personally observed the fracas, and that Alexander had electronic equipment belonging to petitioner. Again, Taggart's testimony shed light on petitioner's supposed state of mind.

Moreover, the non-collateral portions of the proffered testimony were on important issues of the case, if the defense is constitutionally guaranteed to be able to set forth its theory of the case. The jury was instructed on motive, and in this case, the jury was presented evidence on competing motives – one which inferred murderous intent on the part of petitioner, and the other indicating a lack of reason on the part of petitioner to attempt to murder the victims, thereby making it more likely that Stith was the only intentional assailant. Although motive is not an element of attempted murder, it often goes a long way inferentially in establishing (or negating) the required intent. Whatever the ultimate validity of the corroborative testimony at the point of trial, petitioner needed plenty of corroboration, and [allegedly] his counsel deprived him of this opportunity.

---

[2] The statement is relevant for the reason that it was said to petitioner whether or not Whitefield knew something or was making it up. If said, and regardless of the truth of the matter, a reasonable person in petitioner's position would be more likely to believe after simply hearing Whitefield that Alexander was the culprit. As such, the statement is not hearsay.

7

Respondent raises a more valid point, but one that was not made by the Superior Court. If petitioner already knew that Alexander was one of the responsible parties, if not the instigator, he was not the only one. Some of the witnesses proffered by petitioner had spoken in the plural when referring to the perpetrators of the burglary. Petitioner may well have been seeking inculpatory statements from persons he may have thought to have aided Alexander. Petitioner's asking the victims: "Who was responsible" for the burglary may have simply been a method to elicit all desired information. Thus, under this theory, the witnesses who would have testified to Alexander being the culprit would not have negated petitioner's revenge intent towards all those responsible.

Respondent's theory, in the context of all the evidence, is certainly a very real possibility. The question here, however, is whether it is so likely that the jury would probably have rejected petitioner's theory even after hearing all of petitioner's witnesses. That is, would the lack of petitioner's witness testimony have probably not undermined confidence in the verdict. The court declines, at present, to make a final determination on this question for the reasons set forth below.

As previously observed, the Superior Court found the lack of any first-hand witness proffers to be a serious defect. So does the undersigned. While the court notes the practical difficulties for incarcerated pro se filers to obtain declarations from possibly hostile counsel, an attempt at the very least must be made. Moreover, all of the proffered witnesses were friends or acquaintances of petitioner, and it is strange indeed that no such declarations could be provided. Whatever the difficulties in state court, no such first-hand proffers, or explanations regarding the lack thereof have been made. Petitioner is represented by counsel herein; this case has been pending for a number of years. Would it really have been that difficult to obtain a signed declaration from trial counsel or the witnesses themselves? The court does not recollect any requests for investigation or discovery in this case. All that counsel submitted in support of the motion for evidentiary hearing is counsel's summary of a telephone conversation that she had

with witness McCarver.

The court will not schedule an evidentiary hearing before it knows that there is a good reason to hold one, ie., that the witnesses are available, and will testify, more or less, to the substance of petitioner's proffer. There are simply too many resources consumed, from the standpoint of all concerned, to simply schedule the evidentiary hearing and hope that a witness will show up with something material to say. District courts are entitled to ask for a showing of material facts prior to scheduling an evidentiary hearing. Williams v. Woodford, 384 F.3d 567, 590-591 (9th Cir. 2004).

Accordingly, petitioner's motion for an evidentiary hearing is denied without prejudice to its renewal no later than 45 days from the filed date of this order. Any renewed motion shall be accompanied by declarations from the witnesses who are to testify. A declaration shall be submitted from trial counsel concerning his knowledge of any of petitioner's witnesses, whether he was told about these witnesses by petitioner, his view on the bona fides of the proffered testimony, and any other statement pertinent to the reasons he did not call these witnesses at trial. If counsel refuses to submit a declaration, petitioner's counsel may notice his deposition without further order of the court.

After review of any renewed motion, the undersigned will make a final determination on the materiality of the submittals under the appropriate legal standards.

Conclusion

1. Petitioner's motion for evidentiary hearing, Docket # 36, is denied without prejudice;

2. Any renewed motion for evidentiary hearing shall comply with the above direction;

\\\\\

\\\\\

\\\\\

1 | 3. Respondent may file any additional briefing in accordance with the normal
2 | rules of this court;
3 | 4. The court will grant extensions of time for extraordinary reasons only.
4 | DATED: 08/13/08

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
vade1733.ord