1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ERNEST LEE VADEN,

11             Petitioner,               No. CIV S-06-1733 JAM GGH P

12        vs.

13   D.L. RUNNELS,

14             Respondent.               <u>ORDER</u>

15   _____/

16   *Introduction and Summary*

17             As invited by the court, petitioner has made a second attempt at having the court

18   order an evidentiary hearing.  Petitioner has produced what declarations from witnesses as are

19   available.  Nevertheless, after scrutinizing the declarations, and expanding the record pursuant to

20   Rule 7 of the 28 U.S.C. § 2254 rules, the undersigned finds that, in part, the records do not

21   demonstrate that petitioner's trial counsel acted unreasonably, and to the extent the counsel's

22   actions could be found unreasonable, the confidence of the court is not undermined by the new

23   evidence and the record as a whole.  The motion for evidentiary hearing shall be denied.

24   *Background*

25             In order that review of this evidentiary hearing denial may be accomplished by

26   reference to one order, the undersigned borrows generously from the order in this case of August

1

13, 2008.

Petitioner has requested an evidentiary hearing to prove his allegations of ineffective assistance of counsel with respect to his assertion that counsel should have called witnesses to back up his contentions that he had no motive to aid and abet the kidnappings and attempted murders of two juveniles. Petitioner further asserts that the witnesses might well have buttressed his defense theory that he was simply an unwilling, unknowing chauffeur for the perpetrator.

Respondent opposes the motion for evidentiary hearing on several grounds: petitioner did not develop the facts before the state court with sufficient diligence; the new facts supplied make the claim unexhausted; no evidentiary hearing is warranted in any event even considering the new evidence. The first two grounds are problematic procedural grounds the analysis for which would be difficult, and unwarranted in light of the fact that the motion should be denied on its merits. Therefore, the court will not address the procedural grounds.

*Facts*

The request for evidentiary hearing, and especially the prejudice analysis required for an ineffective assistance claim, require a full detailing of the facts. Those facts set forth by the California Court of Appeal on affirming the verdict satisfy this requirement.

On the night of March 28, 2001,FN3 seventeen-year-old A.B. was at home in Vallejo with his friend D.R., who was fifteen years old. A.B. received a page and intended to walk to a pay telephone in order to return the call, as the home telephone was disconnected. As they left the house, they saw appellant Ernest Lee Vaden-an acquaintance of A.B.'s mother-outside sharing a beer. Vaden was with another man, Theodore Stith. A.B. asked if he could borrow Vaden's cell phone. Vaden agreed and led A.B. to his car where the cell phone was.

FN3. All dates refer to the 2001 calendar year unless otherwise indicated.

All four of them walked over to where Vaden's Nissan Maxima was parked and got in the car. Vaden sat in the driver's seat, Stith sat behind him, A.B. was in the front passenger seat and D.R. sat in the back seat behind A.B. Vaden said that he had an errand to run while A.B. returned his telephone call. No one objected to riding along with him. Stith asked Vaden to take him to American Canyon to see a girl. FN4

FN4. This was D.R.'s testimony. A.B. did not recall hearing Stith say this.

Once the telephone call was completed, A.B. noticed that the car was on the freeway heading out of Vallejo. Suddenly, Stith loudly accused A.B. of helping someone burglarize Vaden's home. Stith pulled out a silver semiautomatic pistol and pointed it at A.B. Vaden-although less hostile than Stith-encouraged these accusations. Vaden said "If you don't ... tell me who did it, this [is] going to turn into the shit you see on [sic] the movies." He seemed more upset with the person who had arranged for A.B. to burglarize his home than with A.B. A.B. knew that Vaden's house had been burglarized, but he denied being involved in the crime.

The young men wanted to get out of the car, but there was no chance to do so-they were moving too fast on the freeway. On Stith's command, D.R. emptied his pockets and removed most of his clothing. Stith stated his intention to shoot A.B. Vaden drove off the freeway onto a dark country road FN5 and parked the car. Stith ordered D.R. to remove the last of his clothing. He ordered A.B. to undress, too, ripping the young man's shirt off when he thought A.B. was taking too long to comply. Naked, A.B. and D.R. squatted on the ground as they were ordered to do.

FN5. This road was later identified as Highway 12 outside of Suisun in Solano County.

Vaden continued to question A.B. about the burglary. Vaden said "Why don't you just tell us[?]""Save me a lot of trouble.""We know you did it...." "Just ... say who sent you and we can end this."When Stith seemed to believe A.B.'s denials of involvement and wanted to call things off, Vaden refused. "[N]o, ... it's too far gone. This has to be done," he told his companion. He told Stith: "You shoot him, and then I'm going to shoot the other one."Vaden said to A.B.: "I'm gonna count to three, and then if you don't tell me, you are gonna die."Stith wrapped the barrel of the gun in D.R.'s tee-shirt and pointed it in A.B.'s face.

*2   Vaden stood nearby in the road, acting as lookout. As VadenFN6 counted, Stith shot A.B. in his left eye. D.R. got up and ran when he saw his friend get shot.  He fell into a creek and hid in some nearby bushes.  He could hear Vaden and Stith splashing in the water asking where he went. They left after a minute or two. D.R. waited another 15 or 30 minutes, then headed back toward the freeway. Naked along the freeway, he flagged down a truck driver and told him that A.B. had gotten shot. The driver called the police.

FN6. This was A.B.'s testimony. D.R. told the jury that Stith did the counting, but Vaden ordered him to do so.

Meanwhile, A.B. lay on the ground for some time, thinking only of his pain. After a while, he realized that he was alone. A.B. ran up a hill and hid in some bushes. He heard Vaden, who sounded upset, return to the area saying "We gotta find him." A.B. remained in hiding for about five minutes, at which time he saw the Nissan drive away. He walked about three-quarters of a mile down the road where he found a call box. The police located A.B. standing at a freeway call box. He was naked, muddy, very upset, bleeding from one eye, and shivering.

Vaden was arrested the following day. During a prearrest stakeout of Vaden's apartment, police observed Stith visit the apartment complex while they waited for Vaden. Vaden smelled of alcohol when he was questioned by police, who

suggested that Stith might have been the shooter. Vaden denied any involvement-he told police that he had been out of the area that night and had not seen Stith. On April 2, Vaden was again interviewed by police.

\*\*\*

At trial, D.R. identified Vaden as the driver of the car FN9 and told the jury that Stith had threatened to stab and to shoot A.B. He testified that Stith hit A.B. with the gun while the men kept asking "Who did it?"  Vaden pulled the car over after Stith told Vaden to do so and advised the driver to lean forward so he would not be spattered with blood when Stith shot A.B. Vaden's brother testified that he saw Vaden asleep in his car about 7:00 a.m. on the morning after the incident. Vaden smelled strongly of alcohol at that time.

FN9. In a pretrial photographic lineup, D.R. chose Vaden as the person who looked most like the driver, but was not completely certain of his identification.

Vaden testified in his own defense. He told the jury that his home had been burglarized on March 23 and he asked around his neighborhood about who might have done it. He was angry about the theft of about $7,000 worth of his property. On March 27, an individual-not A.B. or D.R.-showed him some of his stolen goods, then "jumped" him, beating him up and breaking a window in his girlfriend's car. He had the car windows repaired later that day.

Vaden testified that on March 28, he had been intoxicated. He went to A.B.'s house to buy marijuana. Stith was there, too, drinking beer. He asked A.B. if he could purchase some marijuana from him. A.B. told him that his supply was running low and he needed a ride to acquire more. Vaden agreed to drive him. Stith and D.R. came along. Vaden told the jury that Stith pulled out a gun and hit A.B. with it. Stith wanted to know who had taken his drugs. His actions frightened Vaden, who was also concerned that his girlfriend's car would get blood-stained. Stith told him to keep driving and he did as he was told. He testified that Stith said to A.B., "You know you did it." When Stith told Vaden to pull over off Highway 12, he did so.

Stith threatened to kill both A.B. and D.R., but Vaden tried to stop him. They struggled over the gun and it went off. Vaden ran from Stith, who followed him, threatening to kill him, too. When the two men eventually returned to the car, Stith gave Vaden the keys and told him to drive. Stith tossed the gun and some clothing out of the car as they drove away. Vaden dropped Stith off at A.B.'s house, then continued drinking. He woke up at his brother's house. He denied threatening either of the victims or of being partnered with Stith. Stith was trying to get his drugs, not Vaden's stolen property.

Vaden admitted that he had suffered prior felony convictions for robbery and sale of narcotics. (See § 211; Health & Saf.Code, § 11352.) His credibility was further impeached when he admitted that he had failed to tell police that Stith had threatened him, choosing instead to lie about what happened on the night of March 28.

People v. Vaden, 2003 WL 22977662 (Cal. App. 2003).

1        It is of interest that defendant Stith was tried at a later time in his own case.  The

2   evidence received in that case was entirely consistent with the prosecution's evidence in this

3   case.  People v Stith, 2003 WL 22977659 (2003).

4   *The Superior Court Order and This Court's Initial Order*

5        On the face of the petition, petitioner set forth the anticipated testimony of

6   witnesses who would all testify to the fact, in one form or another, that by the day of the

7   attempted murder, petitioner already knew that Rickey Alexander, aka "Thumper," was involved

8   in the burglary of petitioner's home and theft of equipment; moreover, some witnesses would

9   testify to the fact that the victims were involved with drug dealing and inferentially involved with

10  Stith in drug dealing.

11       Witness McCarver would testify that prior to the attempted murders, petitioner

12  telephonically told him that Alexander and his associates were responsible for the burglary of

13  petitioner's home.  Taylor would testify similarly as well as to collateral impeachment of one of

14  the victims.  Whitefield would testify that *he* told petitioner who burglarized petitioner's house.

15  Taggert would have testified that he personally accompanied petitioner to Alexander's house, the

16  day before the attempted murders, where petitioner accused Alexander of burglarizing his place,

17  and received in return a beating by Alexander and his cousin for such allegations.  Taggert would

18  testify as well that Alexander attempted to sell him a keyboard which had come from petitioner's

19  residence.  Perry would have testified that the victims were indeed involved in selling drugs

20  which would have corroborated petitioner's testimony that Stith and the victims were in a

21  disagreement about a drug debt.  Petitioner would have produced two other witnesses with

22  cumulative information to the above.

23       As the parties recognize, neither the Court of Appeal nor the California Supreme

24  Court issued explained decisions.  Therefore, the decision to be reviewed for AEDPA purposes is

25  that of the Superior Court.  After a recitation of the standards for satisfying a claim of ineffective

26  assistance of counsel, the Superior Court denied the petition on two grounds:

1   [1] Petitioner presents no evidence, by affidavit, declaration or other means,
    demonstrating what counsel knew at the time of trial and the reasons for counsel's
2   tactical choices.

3   [2] Furthermore, it is evident that counsel's omissions did not involve critical
    issues and can be explained as a reasonable tactical decision.  Based on
4   Petitioner's descriptions of the testimony that would have been given by the
    witnesses that counsel failed to call, much of their testimony would have been
5   inadmissible hearsay.  The witnesses did not have first hand knowledge of the
    criminal act and most of their testimonies would have relied on what Petitioner
6   told them at some earlier date.  In addition, much of the testimony was irrelevant,
    dealing with possible minor inconsistencies in the prosecution's case...rather than
7   the substantive elements of the charged crimes.

8   Respondent's Exhibit 10 (lodged filings) at 7.

9           The undersigned was further skeptical as well why this supposed testimony was

10  not proffered in the form of declarations of the witnesses involved after all these years, and

11  observed as well that all of the witnesses had friendly connections to petitioner.  Moreover, the

12  court had no declaration, or assertion for that matter, that petitioner told his counsel of the

13  availability of these witnesses at the time of trial.  Petitioner's assertions to the Superior Court

14  and herein had the smell of post- hoc desperation.

15          However, the undersigned did not fully agree with the Superior Court's

16  determination of relevance.  Petitioner's asserted lack of motive to harm the victims was a

17  lynchpin of the defense – the reluctant, unknowing chauffeur.  The less likely that petitioner

18  needed information in order to seek revenge upon the person(s) responsible for the burglary, the

19  more likely that he did not intend to harm the victims.  Assuming their credibility, many of the

20  witnesses testified to admissible, prior consistent statements of petitioner; Whitefield's statement

21  that he told petitioner who was responsible for the burglary is not hearsay at all[1], and is very

22  relevant [to petitioner's defense].  Taggart's testimony was, of course, not hearsay as he

23

24  _____

       [1]  The statement is relevant for the reason that it was said to petitioner whether or not
25  Whitefield knew something or was making it up.  If said, and regardless of the truth of the
    matter, a reasonable person in petitioner's position would be more likely to believe after simply
26  hearing Whitefield that Alexander was the culprit.  As such, the statement is not hearsay.

1    personally observed the fracas, and that Alexander had electronic equipment belonging to

2    petitioner.  Again, Taggart's testimony shed light on petitioner's supposed state of mind.

3            Moreover, the non-collateral portions of the proffered testimony were on

4    important issues of the case, if the defense is constitutionally guaranteed to be able to set forth its

5    theory of the case.  The jury was instructed on motive, and in this case, the jury was presented

6    evidence on competing motives – one which inferred murderous intent on the part of petitioner,

7    and the other indicating a lack of reason on the part of petitioner to attempt to murder the

8    victims, thereby making it more likely that Stith was the only intentional assailant.  Although

9    motive is not an element of attempted murder, it often goes a long way inferentially in

10   establishing (or negating) the required intent.  Whatever the ultimate validity of the corroborative

11   testimony at the point of trial, petitioner needed plenty of corroboration, and [allegedly] his

12   counsel deprived him of this opportunity.

13           Respondent raised a more valid point, but one that was not made by the Superior

14   Court.  If petitioner already knew that Alexander was one of the responsible parties, if not the

15   instigator, he was not the only one.  Some of the witnesses proffered by petitioner had spoken in

16   the plural when referring to the perpetrators of the burglary.  Petitioner may well have been

17   seeking inculpatory statements from persons he may have thought to have aided Alexander.

18   Petitioner's asking the victims: "Who was responsible" for the burglary may have simply been a

19   method to elicit all desired information.  Thus, under this theory, the witnesses who would have

20   testified to Alexander being the culprit would not have negated petitioner's revenge intent

21   towards all those responsible.

22           The undersigned noted in the initial order that the ability of petitioner to obtain

23   evidentiary hearings had been somewhat narrowed by the Supreme Court.  The Supreme Court

24   had recently opined on the standards for granting an evidentiary hearing in Schriro v. Landrigan,

25   __U.S.__, 127 S. Ct. 1933, 1939-1940 (2007), reversing Landrigan v. Schriro, 441 F.3d 638, 650

26   (9th Cir. 2006) (en banc).

1          Schriro first described the familiar test for granting an evidentiary hearing: that if

2  the factual allegations were to be proved, petitioner would be entitled to relief.  See Alberni v.

3  McDaniel, 458 F.3d 860, 873 (9th Cir. 2006).[2]  However, in determining whether relief could be

4  granted, the federal court must apply the AEDPA deferential standards to legal and factual

5  questions necessarily reached by the state courts which might obviate the need for an evidentiary

6  hearing.  Schiro, 127 S. Ct. At 1939-40.  Thus, for example, if the reasons for counsel's actions

7  were at issue, but under deferential standards, the court could not find prejudice, no evidentiary

8  hearing would be necessary.  Similarly, if the state court had made factual findings on the issue at

9  bar, no evidentiary hearing could be held unless petitioner's proffer would constitute clear and

10  convincing evidence.  Importantly, petitioner must have attempted to have developed in the state

11  courts the facts he desires to present in federal court.  Id. at footnote 1.  In addition, if the record

12  refuted the applicant's allegations, i.e., petitioner was making allegations at odds with the

13  established facts of the record, he would not be permitted an evidentiary hearing unless such new

14  facts would clearly and convincingly rebut the record.  Generally phrased allegations, or the

15  failure to submit a proffer of available, specific proof will not clearly and convincingly rebut the

16  record.

17          Respondent's theory, in the context of all the evidence, was certainly a very real

18  possibility.  The question here, however, is whether it is so likely that the jury would probably

19  have rejected petitioner's theory even after hearing all of petitioner's witnesses.  That is, would

20  the lack of petitioner's witness testimony have probably not undermined confidence in the

21  verdict.  The court declined to make a final determination on this question in its initial order.

22          [2]  The Ninth Circuit in Landrigan had reduced the test even further – "[w]e conclude
23  Landrigan has alleged facts that, if demonstrated to be true, present a *colorable* claim that he
   received ineffective assistance of counsel..... Id at 650 (emphasis added).  Thus, district courts
24  were to hold evidentiary hearings not only in cases where the facts, if proven, would entitle the
   petitioner to relief, but in any case where the petitioner had "surpassed the relatively 'low bar' of
25  alleging a colorable claim for relief."  Id.  Under such a test, evidentiary hearings would be
   required in nearly every habeas case presented to federal court in which ineffective assistance or
26  some other extra-record claim was made.

Therefore, as previously stated, petitioner was given an opportunity to submit declarations from the proffered witnesses to demonstrate the need for an evidentiary hearing before the undersigned.  The undersigned specifically directed petitioner to obtain a declaration or deposition from trial counsel.

*The New Evidence Submitted*

Aside from his own declaration, petitioner introduced only three declarations:

1. Jester Taggert

2. Tirrell McCarver

3. Trial Counsel- Robert C. Fracchia

The undersigned will therefore disregard the alleged evidence previously proffered about other witnesses in that if these persons are unavailable to give declarations, it stands to reason that they are unavailable to give testimony at an evidentiary hearing as well.

Taggert's declaration must have been less than that hoped for by petitioner.  It did corroborate that petitioner asked Taggert for a ride, just prior to petitioner's arrest, to go see a person who had his "beat machine," i.e. stereo, and that petitioner got into a fight.  However, Taggert could not identify the person, a very large, black male adult.  Taggert never was asked to buy a keyboard by anyone with the name, Ricky Alexander (which Taggert did not recognize). Taggert did not say, however, that he was ever approached by anyone to buy a keyboard, or any other item of stolen property.  Finally, "Due to the passage of time, my memory of the events I have described is unclear."  There are other problems with the declaration in that petitioner would not have identified "Thumper" as "Alexander" at the time.  See below.

McCarver repeated in his declaration what petitioner had told him of the burglary, petitioner's belief that Ricky Alexander (Thumper) was attempting to sell some of petitioner's property, and that petitioner had been in a fight with Alexander about the property.  McCarver did reveal that he discussed with petitioner advice about whether to identify Alexander to the police in reporting the burglary.  Finally, petitioner did not threaten Alexander in McCarver's

1   presence.  This declaration is discussed further below.

2            Fracchia's declaration does not help petitioner.  This counsel took over the case

3   from previous counsel prior to trial.  Fracchia thoroughly reviewed the file and kept the same

4   investigator previously used on the case.  Importantly, at a time more fresh in petitioner's mind,

5   petitioner revealed that the last name of Thumper was "Thurman," not Alexander.  Fracchia

6   interviewed McCarver, but McCarver revealed petitioner's statement that "some guys in their

7   20s" had jumped him at an apartment complex over his stereo equipment, but petitioner could

8   not identify who were his assailants or even the time of the occurrence.  Petitioner could not

9   relate to his attorney the location of witness Taggart, and counsel's investigator never located this

10  person.   The declaration goes on to relate why other witnesses were not used, or the problems

11  with specific witnesses.  Fracchia did form the belief with at least respect to one potential witness

12  (Martin) that petitioner was attempting to obstruct justice by procuring false testimony.

13           Fracchia described his trial strategy:

14       As a trial tactic, I repeatedly attempted to focus petitioner on trying to play
         down the burglary of his home, as I believe it would have only supported the
15       prosecution's theory of the case.  I saw little or no value in attempting to call
         witnesses who would confirm that Petitioner was obsessed with the burglary of
16       his house to the point of being involved in fights and confrontations over who
         possessed his stolen property.  Even if some of petitioner's witnesses had, in fact,
17       been told by Petitioner that "THUMPER" was the person involved in the burglary,
         they had no personal knowledge of that fact and were relying on information
18       provided to them by Petitioner.  Although Petitioner would be able to testify that
         he did not believe the victims were involved in his burglary, anyone else who
19       offered to corroborate his version of the events would be testifying to inadmissible
          hearsay.
20
         I was further concerned that calling witnesses who would corroborate what
21       petitioner told them would invite the prosecution to call CLARENCE MARTIN to
         show a pattern by petitioner of soliciting false testimony;
22
         Petitioner was prepared to testify that that (sic) he was only at the victim's
23       house to drink, not to confront the victims about the burglary of his residence and
         our independent evidence supported his additional claim that Amir Boutee was
24       involved in drug activity.  Petitioner was further prepared to testify that the events
         leading up to the kidnap and victim's shooting were a complete shock to him,
25       that he was also a victim of Mr. Stith's violence, and that any reference to a theft the
         evening of the shooting was related to the victims' theft of Mr. Stith's drugs.  All
26       witnesses I chose to call were designed to impeach the victims, focus the jury on

                                              10

1      petitioner's anticipated trial testimony, corroborate his claims of fear of Mr. Stith,
     and the support (sic) his claim of the victim's drug activity;

2

3 Fracchia Declaration at 5.

4 _Discussion_

5              As petitioner points out, Mr. Fracchia's testimony is not completely acceptable as

6 it does not take hindsight to understand that the prosecution was making a very big deal over the

7 burglary since it highlighted this motive to the jury to establish petitioner's complicity in the

8 kidnapping/attempted murder.  According to the prosecution, the burglary was the moving event

9 behind the kidnappings and attempted murder.  What trial counsel should have realized is that

10 the proffered testimony, if true, that petitioner had no motive to be in on the crimes, would have

11 on its face complemented petitioner's testimony – not taken away from it, and counteracted the

12 prosecution's emphasis.  Mr. Fracchia is also wrong in his assessment that _all_ of the proffered

13 testimony would have been hearsay; the Taggert observations, for example, were first hand.

14 Some of petitioner's statements may well have qualified as a prior consistent statements.

15 Moreover, certain statements of the other witnesses have relevance simply because they were

16 stated – whether the substance of such were actually true or not – and these type of statements are

17 not hearsay.

18              Nevertheless, the proof offered by petitioner is much less than promised.  First,

19 most of the testimony proffered previously has not been substantiated.  Most of the corroborators

20 are evidently nowhere to be found.  For those two that petitioner supplied declarations, the

21 probative evidence is slight.

22              Taggert is very weak in his declaration – much weaker than counsel's initial

23 proffer.  He suffers from memory diminishment due to the passage of time.  More importantly,

24 he did not know "Alexander," and did not state whether he knew "Thurman," the person who

25 petitioner thought at the time to be "Thumper."  Taggert also refuses to say whether he was

26 solicited to buy any of petitioner's stolen property – he merely states that no one named

1   Alexander tried to sell him a keyboard.  This does not prove that he was ever solicited by anyone

2   connected to the burglary of petitioner's residence.  The fight with a person who was in receipt of

3   petitioner's "beat machine" is corroborated by Taggert, but as respondent has urged, a fight with

4   *one* of the burglars, or *one* of the persons who received stolen property, does not negate the

5   participation of others in the burglary.  This is especially so since there were references on

6   occasion to multiple responsible persons.

7        Declarant McCarver does not fare much better.  Despite trial counsel's opinion to

8   the contrary, McCarver's recitations of petitioner's statements would probably fall within

9   California's prior consistent statement exception to the hearsay rule.  "Prior statements consistent

10  with testimony are, as an exception to the hearsay rule, admitted for the purpose of rehabilitation

11  following an attempt to impeach the testimony."  People v. Gentry,  270 Cal.App.2d 462, 473

12  (1969).  "Evidence Code section 1236 authorizes the admission of hearsay if the statement is

13  consistent with a witness's trial testimony and is offered in compliance with Evidence Code

14  section 791.  Evidence Code section 791, subdivision (b) allows a prior consistent statement if

15  offered after '[a]n express or implied charge has been made that [the witness's] testimony at the

16  hearing is recently fabricated or is influenced by bias or other improper motive, and the statement

17  was made before the bias, motive for fabrication, or other improper motive is alleged to have

18  arisen.'"  People v. Farnam  28 Cal.4th 107, 158 (2002); see also People v. Bolin , 18 Cal.4th

19  297, 320-321 (1998).

20       Nevertheless, McCarver's testimony would not add much except confusion.  Trial

21  counsel is adamant that petitioner never referenced "Thumper" as "Alexander."  During all of

22  defense preparation, petitioner believed the "burglar" to have the last name "Thurman."

23  Moreover, the fight with whomever, perhaps Alexander, does not prove in any way that

24  Alexander was the lone burglar.  All we know from McCarver's testimony is that Alexander,

25  perhaps Thurman, was in possession of petitioner's property (in petitioner's belief) at the time of

26  the confrontation; how the property got to this person is anyone's guess.  Although the important

1   point is that petitioner allegedly thought Thurman to be involved in the burglary, petitioner seems

2   careful to avoid stating that he thought Thurman to be the *only* person involved.  More

3   importantly, the proffered evidence does not dispel the victims' powerful testimony that

4   petitioner was strongly questioning them about their knowledge/complicity in the burglary while

5   in the car.

6          The penultimate question for this claim is whether an evidentiary hearing might

7   demonstrate that counsel was ineffective at trial, i.e., acted unreasonably, such that the

8   undersigned's confidence in the outcome was undermined.  See Scott v. Schriro, __F.3d_, 2009

9   WL 1519878 *9 (June 2, 2009) citing  Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct.

10  2052 (1984).  Both prongs must be satisfied.

11         It is difficult to assess on this record whether counsel's actions were unreasonable.

12  His evidentiary assessment of the proffered evidence appears to have been mainly in error.

13  Nevertheless, counsel's desire to have the prosecution avoid calling a witness who would

14  demonstrate petitioner's attempt to procure false testimony, a devastating admission, may have

15  called for not presenting any of petitioner's purported witnesses regardless of their otherwise

16  corroborative value.  In the final analysis, it is not necessary to make a finding here because

17  petitioner has not demonstrated prejudice from his proffer such that it is necessary to hold an

18  evidentiary hearing.

19         First, counsel looked for Taggart, but could not locate him.  Petitioner does not

20  fault these efforts, so no matter what the substance of Taggart's testimony, he would not have

21  been available at trial.  As discussed above, McCarver's testimony would have done little to help

22  petitioner's cause.  But more importantly, both Taggart's and McCarver's testimony, when

23  viewed against the chilling rendition of both victims at trial, appears to be totally inadequate to

24  rebut the victim's testimony.  As detailed in that testimony, petitioner was anything but the

25  reluctant chauffeur.  Petitioner offers no explanation concerning why the victims would fabricate

26  testimony to convict petitioner if Stith were the only culprit.  Petitioner offers no legitimate

explanation concerning why he lied to the police about not being with Stith on the day of the kidnapping if he were the victim of Stith's actions as well.  The change in names of the alleged burglar from Thurman to Alexander defies clear explanation.  In sum, it is not a close question about whether petitioner's belated proffered testimony undermines the undersigned's confidence such that the fuller (if that is possible) exploration of the testimony at evidentiary hearing makes it worthwhile to do.  Under Supreme Court direction, it is not appropriate to hold the requested evidentiary hearing.

*Conclusion*

Petitioner's renewed motion for an evidentiary hearing (Docket #44) is denied.

DATED:   06/16/09

/s/ Gregory G. Hollows

_____
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
vade1733.ord