1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ERNEST LEE VADEN,

11              Petitioner,                    No. CIV S-06-1733 JAM GGH P

12         vs.

13   D.L. RUNNELS, et al.,

14              Respondents.          FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 convictions for two

19   counts of attempted first degree murder, two counts of kidnapping and two counts of second

20   degree robbery.  Petitioner is serving a sentence of 166 years to life.

21              This action is proceeding on the amended petition filed May 18, 2007, as to the

22   following claims: 1) ineffective assistance of counsel based on counsel's failure to present

23   several witnesses; 2) ineffective assistance of counsel based on counsel's failure to present

24   medical records regarding petitioner's treatment for alcohol abuse; 3) ineffective assistance of

25   counsel based on counsel's failure to present expert testimony in support of petitioner's

26   intoxication defense; 4) ineffective assistance of counsel based on counsel's failure to object to

1   the late notice of prosecution's expert firearms witness; 5) ineffective assistance of counsel based

2   on counsel's failure to effectively impeach a key witness; 6) petitioner's sentence is

3   unconstitutionally based on facts not found by a jury beyond a reasonable doubt; 7) the trial court

4   improperly denied petitioner's motion for substitute counsel; 8) jury instruction error (2 claims);

5   9) cumulative error.

6           After carefully considering the record, the court recommends that the petition be

7   denied.

8   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

9           The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

10  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

11  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

12  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

13  standards of review to be used by a federal habeas court in assessing a state court's adjudication

14  of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

15  (9th Cir. 1997).

16          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

17  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

18  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

19  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

20  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

21  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

22  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

23  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

24          "Unreasonable application" of established law, on the other hand, applies to

25  mixed questions of law and fact, that is, the application of law to fact where there are no factually

26  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

1  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

2  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

3  deference is not blindly automatic, "the most important point is that an *unreasonable* application

4  of federal law is different from an incorrect application of law....[A] federal habeas court may not

5  issue the writ simply because that court concludes in its independent judgment that the relevant

6  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

7  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

8  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

9  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

10 authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

11         The state courts need not have cited to federal authority, or even have indicated

12 awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

13 Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

14 contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

15 unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

16 occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

17 established Supreme Court authority reviewed must be a pronouncement on constitutional

18 principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

19 binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

20         However, where the state courts have not addressed the constitutional issue in

21 dispute in any reasoned opinion, the federal court will independently review the record in

22 adjudication of that issue.  "Independent review of the record is not de novo review of the

23 constitutional issue, but rather, the only method by which we can determine whether a silent state

24 court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

25 2003).

26 \\\\\

1    When reviewing a state court's summary denial of a claim, the court "looks

2  through" the summary disposition to the last reasoned decision. <u>Shackleford v. Hubbard</u>, 234

3  F.3d 1072, 1079 n. 2 (9th Cir. 2000).

4  III.  <u>Factual Background</u>

5    The opinion of the California Court of Appeal contains a factual summary.  After

6  independently reviewing the record, the court finds this summary to be accurate and adopts it

7  below.

8    I. FACTS

9  On the night of March 28, 2001,FN3 seventeen-year-old A.B. was at home in
   Vallejo with his friend D.R., who was fifteen years old. A.B. received a page and
10  intended to walk to a pay telephone in order to return the call, as the home
    telephone was disconnected. As they left the house, they saw appellant Ernest Lee
11  Vaden-an acquaintance of A.B.'s mother-outside sharing a beer. Vaden was with
    another man, Theodore Stith. A.B. asked if he could borrow Vaden's cell phone.
12  Vaden agreed and led A.B. to his car where the cell phone was.

13  FN3. All dates refer to the 2001 calendar year unless otherwise indicated.

14  All four of them walked over to where Vaden's Nissan Maxima was parked and
    got in the car. Vaden sat in the driver's seat, Stith sat behind him, A.B. was in the
15  front passenger seat and D.R. sat in the back seat behind A.B. Vaden said that he
    had an errand to run while A.B. returned his telephone call. No one objected to
16  riding along with him. Stith asked Vaden to take him to American Canyon to see a
    girl.FN4
17
    FN4. This was D.R.'s testimony. A.B. did not recall hearing Stith say this.
18
    Once the telephone call was completed, A.B. noticed that the car was on the
19  freeway heading out of Vallejo. Suddenly, Stith loudly accused A.B. of helping
    someone burglarize Vaden's home. Stith pulled out a silver semiautomatic pistol
20  and pointed it at A.B. Vaden-although less hostile than Stith-encouraged these
    accusations. Vaden said "If you don't ... tell me who did it, this [is] going to turn
21  into the shit you see on [ sic ] the movies." He seemed more upset with the person
    who had arranged for A.B. to burglarize his home than with A.B. A.B. knew that
22  Vaden's house had been burglarized, but he denied being involved in the crime.

23  The young men wanted to get out of the car, but there was no chance to do so-they
    were moving too fast on the freeway. On Stith's command, D.R. emptied his
24  pockets and removed most of his clothing. Stith stated his intention to shoot A.B.
    Vaden drove off the freeway onto a dark country road FN5 and parked the car.
25  Stith ordered D.R. to remove the last of his clothing. He ordered A . B. to undress,
    too, ripping the young man's shirt off when he thought A.B. was taking too long to
26  comply. Naked, A.B. and D.R. squatted on the ground as they were ordered to do.

4

FN5. This road was later identified as Highway 12 outside of Suisun in Solano County.

Vaden continued to question A.B. about the burglary. Vaden said "Why don't you just tell us[?]" "Save me a lot of trouble." "We know you did it...." "Just ... say who sent you and we can end this." When Stith seemed to believe A.B.'s denials of involvement and wanted to call things off, Vaden refused. "[N]o, ... it's too far gone. This has to be done," he told his companion. He told Stith: "You shoot him, and then I'm going to shoot the other one." Vaden said to A.B.: "I'm gonna count to three, and then if you don't tell me, you are gonna die." Stith wrapped the barrel of the gun in D.R.'s tee-shirt and pointed it in A.B.'s face.

Vaden stood nearby in the road, acting as lookout. As Vaden FN6 counted, Stith shot A.B. in his left eye. D.R. got up and ran when he saw his friend get shot. He fell into a creek and hid in some nearby bushes. He could hear Vaden and Stith splashing in the water asking where he went. They left after a minute or two. D.R. waited another 15 or 30 minutes, then headed back toward the freeway. Naked along the freeway, he flagged down a truck driver and told him that A.B. had gotten shot. The driver called the police.

FN6. This was A.B.'s testimony. D.R. told the jury that Stith did the counting, but Vaden ordered him to do so.

Meanwhile, A.B. lay on the ground for some time, thinking only of his pain. After a while, he realized that he was alone. A.B. ran up a hill and hid in some bushes. He heard Vaden, who sounded upset, return to the area saying "We gotta find him." A.B. remained in hiding for about five minutes, at which time he saw the Nissan drive away. He walked about three-quarters of a mile down the road where he found a call box. The police located A.B. standing at a freeway call box. He was naked, muddy, very upset, bleeding from one eye, and shivering.

Vaden was arrested the following day. During a prearrest stakeout of Vaden's apartment, police observed Stith visit the apartment complex while they waited for Vaden. Vaden smelled of alcohol when he was questioned by police, who suggested that Stith might have been the shooter. Vaden denied any involvement-he told police that he had been out of the area that night and had not seen Stith. On April 2, Vaden was again interviewed by police.

In May, Vaden was charged by information with two counts each of attempted premeditated and deliberated murder, kidnapping and second degree robbery. The information also alleged that Vaden was armed with a firearm during the commission of these offenses; that he had served two prior prison terms and had suffered three prior serious felony convictions. (See §§ 187, subd. (a), 207, subd. (a), 211, 664, 667, subd. (a)(1); former §§ 667.5, subd. (a), 12022, subd. (d) .) In June, a trial date of October 3 was set.

In August, Vaden wrote to his attorney to ask that he be removed as counsel. He filed his first Marsden motion later that month, which was heard and denied on September 25. The trial date was continued to January 2002. Vaden filed a motion for reconsideration of the trial court's September denial of his Marsden motion. This time, in October, his Marsden motion was granted. A new attorney was

appointed to represent Vaden. In January 2002, trial was continued until March 2002.

On March 7, 2002, Vaden's motion to set aside the information was denied. (See § 995.) His motion to bifurcate the trial of his prior convictions from that of the newly charged offenses was granted and he waived jury trial on the prior conviction allegations. His motion to exclude impeachment use of his prior convictions if he opted to testify was granted in part and denied in part.

Trial actually began in June 2002. A.B.FN7 and D.R.FN8 both testified. The jury heard the call that A.B. placed at the call box. In it, he told the dispatcher that his watch had been stolen. He never recovered his watch. A.B. told the jury that he was blind in his left eye.

FN7. He admitted that when he was a juvenile, he had been on probation for receiving stolen property and that he was currently on felony probation after being convicted of possession of cocaine for sale.

FN8. He admitted being on juvenile probation for petty theft and commercial burglary.

At trial, D.R. identified Vaden as the driver of the car FN9 and told the jury that Stith had threatened to stab and to shoot A.B. He testified that Stith hit A.B. with the gun while the men kept asking "Who did it?" Vaden pulled the car over after Stith told Vaden to do so and advised the driver to lean forward so he would not be spattered with blood when Stith shot A.B. Vaden's brother testified that he saw Vaden asleep in his car about 7:00 a.m. on the morning after the incident. Vaden smelled strongly of alcohol at that time.

FN9. In a pretrial photographic lineup, D.R. chose Vaden as the person who looked most like the driver, but was not completely certain of his identification.

Vaden testified in his own defense. He told the jury that his home had been burglarized on March 23 and he asked around his neighborhood about who might have done it. He was angry about the theft of about $7,000 worth of his property. On March 27, an individual-not A.B. or D.R.-showed him some of his stolen goods, then "jumped" him, beating him up and breaking a window in his girlfriend's car. He had the car windows repaired later that day.

Vaden testified that on March 28, he had been intoxicated. He went to A.B.'s house to buy marijuana. Stith was there, too, drinking beer. He asked A.B. if he could purchase some marijuana from him. A.B. told him that his supply was running low and he needed a ride to acquire more. Vaden agreed to drive him. Stith and D.R. came along. Vaden told the jury that Stith pulled out a gun and hit A.B. with it. Stith wanted to know who had taken his drugs. His actions frightened Vaden, who was also concerned that his girlfriend's car would get blood-stained. Stith told him to keep driving and he did as he was told. He testified that Stith said to A.B., "You know you did it." When Stith told Vaden to pull over off Highway 12, he did so.

Stith threatened to kill both A.B. and D.R., but Vaden tried to stop him. They

6

struggled over the gun and it went off. Vaden ran from Stith, who followed him, threatening to kill him, too. When the two men eventually returned to the car, Stith gave Vaden the keys and told him to drive. Stith tossed the gun and some clothing out of the car as they drove away. Vaden dropped Stith off at A.B.'s house, then continued drinking. He woke up at his brother's house. He denied threatening either of the victims or of being partnered with Stith. Stith was trying to get his drugs, not Vaden's stolen property.

Vaden admitted that he has suffered prior convictions for robbery and sale of narcotics. (See § 211; Health & Saf. Code, § 11352.)  His credibility was further impeached when he admitted that he had failed to tell police that Stith had threatened him, choosing instead to lie about what happened on the night of March 28.

Respondent's Lodged Document 6, pp. 2-6.

IV.  Discussion

     A.  Ineffective Assistance of Counsel: Failure to Call Witnesses

Petitioner alleges that counsel was ineffective for failing to investigate and prepare the testimony of Terrell McCarver, Shawn Taylor, Durrell Whitfield, Jesture Taggart, Annalisa Pearsall, two fingerprint technicians and David Perry.  On October 17, 2007, petitioner filed a motion for an evidentiary hearing as to this claim.  See court file doc. # 36.  On August 13, 2008, the court denied this motion without prejudice.  See court file doc. # 40.  The court ordered that petitioner could renew his motion so long as it was accompanied by declarations from the witnesses who were to testify.  Id.

On October 29, 2008, petitioner filed a renewed motion for an evidentiary hearing.  See court file doc. # 44.  On June 16, 2009, the court denied this motion.  See court file doc. # 50.  For the reasons stated in that order, the instant claim of ineffective assistance of counsel should be denied.

     B.  Ineffective Assistance of Counsel Claims re: Intoxication Defense

     *Standards for Ineffective Assistance of Counsel*

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of

7

1   reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

2   identify the acts or omissions that are alleged not to have been the result of reasonable

3   professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

4   whether in light of all the circumstances, the identified acts or omissions were outside the wide

5   range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

6   counsel's conduct was within the wide range of reasonable assistance, and that he exercised

7   acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

8   695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

9          Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

10  693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

11  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

12  694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

13  confidence in the outcome."  Id., 104 S. Ct. at 2068.

14         In extraordinary cases, ineffective assistance of counsel claims are evaluated

15  based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

16  1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

17         The Supreme Court has recently emphasized the importance of giving deference

18  to trial counsel's decisions, especially in the AEDPA context:

19         In Strickland we said that "[j]udicial scrutiny of a counsel's
           performance must be highly deferential" and that "every effort
20         [must] be made to eliminate the distorting effects of hindsight, to
           reconstruct the circumstances of counsel's challenged conduct, and
21         to evaluate the conduct from counsel's perspective at the time."
           466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is
22         presented with an ineffective-assistance claim not subject to §
           2254(d)(1) deference, a [petitioner] must overcome the
23         "presumption that, under the circumstances, the challenged action
           'might be considered sound trial strategy.'"  Ibid. (quoting Michel
24         v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

25         For [petitioner] to succeed, however, he must do more than show
           that he would have satisfied Strickland's test if his claim were
26         being analyzed in the first instance, because under § 2254(d)(1), it

                                          8

1   is not enough to convince a federal habeas court that, in its
    independent judgment, the state-court decision applied <u>Strickland</u>
2   incorrectly.  <u>See</u> <u>Williams</u>, <u>supra</u>, at 411, 65 S. Ct. 363.[1]  Rather, he
    must show that the [ ]Court of Appeals applied <u>Strickland</u> to the
3   facts of his case in an objectively unreasonable manner.

4   <u>Bell v. Cone</u>, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

5                  *Discussion*

6          Petitioner raises two claims regarding counsel's failure to adequately present a

7   voluntary intoxication defense.  First, petitioner argues that counsel was ineffective for failing to

8   present medical records establishing that he was treated for excessive alcohol consumption on

9   the date of the incident.  The Solano County Superior Court was the last state court to issue a

10  reasoned opinion addressing this claim.  Respondent's Exhibit 10.  Second, petitioner argues that

11  counsel was ineffective for failing to present expert testimony in support of his intoxication

12  defense.  The California Supreme Court denied this claim without comment or citation.

13  Respondent's Exhibit 12.

14         The court will first set forth the following background information regarding these

15  claims.

16         Evidence of voluntary intoxication is "admissible solely on the issue of whether or

17  not the defendant actually formed a required specific intent, or, when charged with murder,

18  whether the defendant premeditated, deliberated, or harbored express malice aforethought."  Cal.

19  Penal Code § 22.  Petitioner was convicted of kidnapping, attempted first degree murder and

20  robbery.  Because kidnapping is a general intent crime, evidence of petitioner's voluntary

21  intoxication was not relevant to his kidnapping convictions.[2]

22
          ───────────────────

23         [1] This internal citation should be corrected to <u>Williams v. Kaiser</u>, 323 U.S. 471, 477, 65
    S. Ct. 363 (1945).

24         [2]  Petitioner was not convicted of kidnapping on an aider and abettor liability theory.  RT
    at 382: 16-23; 386: 26-28, 387: 1-4.  Had he been, evidence of his voluntary intoxication would
25  have been admissible as to the kidnapping charges.  <u>People v. Mendoza</u>, 18 Cal.4th 1114, 1131,
    77 Cal.Rptr.2d 428 (1998)  (jury may consider evidence of defendants's voluntary intoxication in
26  deciding whether he or she had the knowledge or intent necessary for aiding and abetting

                                    9

1          Petitioner was convicted of first degree murder and robbery based on aider and

2   abettor liability.  RT at 386:21-25; 387: 5-12, 392: 22-27.  An aider and abettor must "act with

3   knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of

4   committing, or of encouraging or facilitating commission of, the offense."  People v. Beeman, 35

5   Cal.3d 547, 560, 199 Cal.Rptr. 50 (1984).  The jury must find "the intent to encourage and bring

6   about conduct that is criminal, not the specific intent that is an element of the target offense...."

7   People v. Croy, 41 Cal.3d 1, 12, fn. 5, 221 Cal.Rptr. 592 (1985).

8          In People v. Mendoza, 18 Cal.4th 1114, 1123, 77 Cal.Rptr.2d 428 (1998), the

9   California Supreme Court reasoned that the intent requirement for aiding and abetting liability is

10  a "required specific intent" for purposes of Cal.Penal Code § 22(b), and since the required mental

11  state cannot be mechanically divided into knowledge and intent, the jury may consider

12  intoxication on both the defendant's knowledge and intent in determining whether the defendant

13  is liable as an aider and abettor.  Mendoza, 18 Cal.4th at 1131, 77 Cal.Rptr.2d 428.

14         Pursuant to Mendoza, to succeed on a voluntary intoxication defense, petitioner in

15  the instant case would have to demonstrate that, as a result of his intoxication, he did not

16  knowingly and intentionally aid and abet Stith in the attempted robberies and attempted murders.

17         Petitioner first argues that counsel was ineffective for failing to present medical

18  records establishing that he was treated for excessive alcohol consumption on the date of the

19  incident in support of a voluntary intoxication defense.  Petitioner argues that prior to trial,

20  counsel had obtained petitioner's medical records from Kaiser Permanent Medical Group in

21  Vallejo, California.  A copy of those records is attached to the amended petition as Exhibit B.

22  Those records indicate that on March 28, 2001, petitioner went to Kaiser complaining that he had

23  been vomiting blood that morning and had been drinking heavily.  Amended Petition, Exhibit P,

24  p. 4 of 9.  The record also states that petitioner stated that he had a history of alcohol abuse.  Id.

25  _____

26  regardless of whether the target crime required general or specific intent.)

1   The record also states that petitioner stated that someone had recently stolen $7000 worth of

2   equipment from him and that he was under a great stress.  Id.  Petitioner also stated that his last

3   drink was yesterday.  Id.  He also stated that he felt dizzy when standing.  Id.

4           According to the physician's record from March 28, 2001, petitioner stated that he

5   had been binging on alcohol for 5 days.  Id., at 5 of 9.  Petitioner was diagnosed with alcohol

6   withdrawal, vomiting and gastritis.  Id., at 6 of 9.  Petitioner was given an IV containing "1.0" of

7   Ativan.  Id., at 7 of 9.  Petitioner was discharged at 10:55 a.m. at which time he stated that he was

8   feeling much better.  Id., at 8 of 9.

9           Attached as exhibit C to the amended petition is the entry in the Physician's Desk

10   Reference (PDR) for Ativan.  The PDR states that Ativan may intensify the effects of alcohol.

11   Amended Petition, Exhibit C, p. 2 of 3.  The PDR also states that the daily dose may vary from 1

12   to 10 milligrams.  Id., p. 3 of 3.  The PDR also states that the usual starting dose is 2 to 3

13   milligrams per day taken in 2 or 3 smaller doses.  Id.

14           Petitioner argues that his Kaiser records, combined with the information in the

15   PDR, demonstrate that he was in the midst of an alcoholic binge on the date of the incident and

16   that he had been treated for Ativan, a mood altering substance intensified by alcohol

17   consumption.  Petitioner argues that this evidence, combined with the evidence at trial that

18   established that he continued to drink after his discharge from Kaiser, demonstrates that he was

19   severely impaired.  Petitioner also argues that the fact that he was medicated with Ativan could

20   be considered involuntary intoxication, which would have been a complete defense to the

21   charged offenses.

22           There are several problems with petitioner's argument.  Most importantly, the

23   evidence at trial does not suggest that petitioner was so intoxicated that he was incapable of

24   having the knowledge and intent necessary to aid and abet Stith in committing the attempted

25   murders and robberies.  Petitioner's ability to remember in detail his version of the incident, as

26   shown by his trial testimony, undermines this claim.  Petitioner's ability to drive from Vallejo to

1  Suisun, at the direction of Stith, also demonstrates that he was capable of having the necessary

2  knowledge and intent.[3]  Petitioner's claim that he tried to stop Stith from shooting the gun also

3  suggests a level of awareness that an intoxicated person incapable of having the necessary

4  knowledge and intent would not have.

5         Victim Boutte also testified that he had seen petitioner drunk in the past.  RT at

6  164.  Boutte testified that on the night of the incident, petitioner did not seem drunk.  RT at 164.

7         The medical records submitted by petitioner also do not demonstrate that at the

8  time of the incident he was intoxicated at a level that would have impacted his ability to have the

9  necessary knowledge and intent.  According to the medical records from Kaiser, petitioner stated

10  that he had not had a drink since the day before.  His diagnosis of alcohol withdrawal suggests

11  that he was not intoxicated at the time he went to the hospital.  The hospital records also make no

12  mention of any behavior by petitioner suggesting intoxication.

13         Petitioner's argument that the combination of Ativan with alcohol caused him to

14  be even more intoxicated is speculative.  While it is true that petitioner drank alcohol after he left

15  the hospital, his behavior during the incident does not suggest that the combination of Ativan and

16  alcohol rendered him so intoxicated that he was unable to have the necessary knowledge and

17  intent.  In addition, as observed by respondent, petitioner was given a low dose of Ativan at the

18  hospital.  For all of these reasons, the court finds that petitioner's counsel was not ineffective for

19  failing to introduce the hospital records at trial.

20         Overindulgence in illegal drugs or alcohol does not *per se* warrant the giving of an

21  intoxication instruction.  One must present evidence that he is legally unconscious.  Under

22  California law when a person renders himself unconscious through voluntary intoxication and

23  kills in that state, the killing is attributed to his negligence and is treated as involuntary

24  manslaughter.  <u>People v. Ochoa</u>, 19 Cal. 4th at p. 423, 79 Cal. Rptr. 2d 408.  Unconsciousness

25

26      [3]  Petitioner testified that Stith told him where to drive.  RT at 266.

12

for this purpose need not mean that the actor lies still and unresponsive.  Id. at 423-424, 79 Cal.
Rptr. 2d 408.  Instead, a person is deemed "unconscious" if he committed the act without being
conscious thereof.  Id.  See also CALJIC 8.47 "If you find that a defendant, *while unconscious
as a result of voluntary intoxication*...When a person voluntarily induces his own intoxication *to
the point of unconsciousness*..." (emphasis added).  Although unconsciousness does not require
the incapacity to move or act, the given definition is somewhat of a tautology; however, other
cases and authority define the level of lack of consciousness – and the level is very difficult to
reach.  One court has held that the level is that of an automaton.  People v. Webber, 228 Cal.
App. 3d 1146, 1163, 279 Cal. Rptr. 437 (1991).[4]  In other cases, courts found insufficient
evidence to support a sua sponte intoxication jury instruction when (1) the defendant had drunk
some beer and whiskey and was "'pretty well plastered,'" People v. Spencer , 60 Cal. 2d 64, 88,
31 Cal. Rptr. 782 (1963); (2) the defendant had been drinking for several hours, but was "only
woozy and not completely 'blacked out'" People v. Simpson  192 Cal. App. 3d 1360, 1370, 237
Cal. Rptr. 910) (1987); (3) the defendant had been drinking before the crime; he appeared to be
"'a little high'" at the time of the crime, and he testified he was "'pretty drunk,'" (People v. Cram
(1970) 12 Cal. App. 3d 37, 42, 90 Cal. Rptr. 393 (1970)); and (4) the defendant had drunk a
dozen beers and some wine and thought he was drunk, but knew what he was doing, People v.
Gonzales (1970) 4 Cal. App. 3d 593, 607, 84 Cal. Rptr. 863 (1970).  Petitioner herein, as clearly
demonstrated  by the record, was far from the required showing of unconsciousness.

Petitioner also argues that had counsel called an expert to testify regarding his
alcohol and Ativan intoxication, the outcome of the trial would most likely have been different.
However, petitioner has provided no declaration from an expert supporting this claim.
Speculation about what an expert could have said is not enough to establish prejudice.  See

---

[4] "Automaton" is defined in this context as "a person or animal acting in an automatic or
mechanical way."  *Webster's New World Dictionary*, Third College Edition at 93.  "Automatic"
in its pertinent meaning is defined: "done without conscious thought or volition, as if
mechanically, or from force of habit."  Id.

1  Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997).

2          After conducting the AEDPA review, the court finds that the denial of these

3  claims by the Superior Court and the California Supreme Court was not an unreasonable

4  application of clearly established Supreme Court authority.  Accordingly, these claims should be

5  denied.

6          C.  Ineffective Assistance of Counsel: Failure to Object to Firearms Expert

7          The California Supreme Court denied this claim without comment or citation.

8  Respondent's Exhibit 12.

9          Petitioner argues that at trial, without advance notice, the government presented

10  the rebuttal testimony of Eric Thelan, a firearms expert who testified that a gun, such as the one

11  used by Stith, could malfunction if wrapped with a cloth around the barrel.  This testimony

12  implied that petitioner was lying when he testified that he tried to stop Stith from shooting

13  Revada.  Petitioner contends that Thelan's testimony implied that the reason Stith did not shoot

14  Revada was because the weapon malfunctioned.

15          Petitioner argues that counsel was ineffective for failing to object to Thelan's

16  testimony on several grounds.  Petitioner first argues that counsel should have objected because

17  there was inconsistent evidence regarding the type of weapon Stith used.  The gun was not

18  introduced as evidence at trial.  Thelan testified that semi-automatic pistols are very

19  temperamental with a tendency to jam.  RT at 315.  Thelan testified that if a t-shirt was wrapped

20  around a semi-automatic, it would cause the gun to jam.  RT at 316.  Boutte testified that the gun

21  was a semi-automatic.  RT at 57.  Petitioner contends that, in contrast, Revada testified that the

22  gun was an automatic, as opposed to a semi-automatic.  Revada's testimony regarding the type of

23  gun used went as follows:

24          Q: Okay.  Do you know the difference between a revolver and a semi-automatic?

25          A: Um, yes.

26          Q: Okay.  What kind of gun was this?

1        A: It was an automatic.

2  RT at 73.

3        In asking what kind of gun was used, the prosecutor was asking Revada whether

4  the gun was a revolver or a semi-automatic.  Although Revada answered "automatic," he was not

5  clearly testifying that the gun was a type other than that suggested by the prosecutor.  Petitioner's

6  argument that Revada testified that the gun was an automatic, as opposed to a semi-automatic, is

7  a stretch.  An objection to Thelan's testimony on grounds that Revada had testified that the gun

8  was an automatic would have been overruled.

9        Petitioner also argues that Thelan's testimony was not relevant because there was

10  no testimony that the gun jammed.   While this is true, Thelan's testimony was relevant to

11  showing that the reason Revada was not shot because the gun jammed.  An objection to Thelan's

12  testimony on this ground would have been overruled.

13        Petitioner next argues that counsel should have objected because the prosecutor

14  presented this expert testimony without 30 days prior notice to defense counsel.  Cal. Penal Code

15  section 1054 et seq. requires the prosecution to disclose to the defense the names and addresses

16  of persons it intends to call as witnesses at trial if this information is in the possession of the

17  prosecuting attorney.  Cal. Penal Code section 1054.7 provides that "[i]f the material and

18  information becomes known to, or comes into the possession of, a party within 30 days of trial,

19  disclosure shall be made immediately, unless good cause is shown why a disclosure should be

20  denied, restricted, or deferred."

21        On June 19, 2002, during pretrial hearings, the prosecutor indicated that he added

22  Thelan as a witness.  RT at 19: 20.  While disclosure was not made 30 days prior to trial, it was

23  made before the trial began.  For this reason, an objection by defense counsel to Thelan's

24  testimony on grounds that it was a surprise would have been rejected.

25        Finally, assuming that defense counsel should have objected to Thelan's

26  testimony on the grounds alleged, it is very unlikely that the outcome of the trial would have

1  been different had Thelan's testimony been excluded because the evidence against petitioner was

2  strong.  The court has reviewed the record and finds that petitioner's version of events was not

3  credible.[5]  Admission of Thelan's testimony, assuming it was improper, did not prejudice

4  petitioner.

5          The denial of this claim by the California Supreme Court was not an unreasonable

6  application of clearly established Supreme Court authority.  Accordingly, this claim should be

7  denied.

8                  D.  Ineffective Assistance of Counsel: Failure to Impeach

9          The California Supreme Court denied this claim without comment or citation.

10  Respondent's Exhibit 12.

11          Petitioner argues that trial counsel was ineffective for failing to impeach Revada

12  with contrary evidence.  In particular, Revada testified that he had not seen either petitioner or

13  Stith before the date of the incident.  RT at 70.  Petitioner now claims that he could have

14  impeached this testimony with testimony of Revada's mother and his cousin, Kenyate, who

15  would have testified that Revada was acquainted with petitioner and Stith prior to the incident.

16  Kenyate would have testified that petitioner was Kenyate's godfather.  Petitioner does not state

17  what specifically Revada's mother would have testified.  Petitioner also has not provided

18  declarations from either Kenyate or Revada's mother.

19          This claim fails because petitioner has not provided declarations from either

20  Kenyate or Revada's mother demonstrating their willingness to testify and, especially with regard

21  to Revada mother, what they would have testified to.  In particular, there is no declaration from

22

23          [5]  The court was struck by the cross-examination of petitioner by the prosecutor.  During
    this cross-examination, petitioner admitted that when he was first questioned by police regarding
24  the incident, he repeatedly "declined the opportunity" to state what happened that night.  RT at
    282.  Petitioner also told the interviewing officer that he had "damn near raised" Boutte.  RT at
25  286.  Petitioner testified that he cared for Boutte's well-being.  RT at 287.  When asked why he
    did not call the police after seeing Boutte shot in the face, petitioner answered, "I didn't have
26  time to, really."  RT at 287.   In contrast to petitioner's wobbly story, Boutte and Revada testified
    consistently regarding the incident.

either person stating that Revada actually knew petitioner and Stith prior to the incident.  See

Allen v. Woodford, 395 F.3d 979, 1002 n. 2 (9th Cir. 2004) (district court correctly disregarded

counsel's failure to call witnesses because petitioner made no showing that they would have

testified); Dows v. Wood, 211 F.3d 480, 486-487 (9th Cir. 2000) (petitioner presented no

evidence that alleged alibi witness actually existed or that they would have provided helpful

testimony; i.e. presented no affidavit from the witness);  Bragg v. Galaza, 242 F.3d 1082, 1088

(9th Cir.2001) (petitioner failed to identify what witness would have said, thus his claim was

wholly speculative); United States v. Berry, 814 F.2d 1406, 1409 (9th Cir.1989) (petitioner

"offers no indication of what these witnesses would have testified to, or how their testimony

might have changed the outcome of the hearing").

In addition, as observed by respondent, even if this claim were properly presented,

petitioner has not demonstrated prejudice.  Whether Revada had ever seen petitioner or Stith

before was not a key issue.  Petitioner did not claim to have known Revada before the incident,

although he testified that he had known Boutte for five years.  RT at 257.  Impeaching Revada on

this minor point would not have changed the outcome of the trial.

The denial of this claim by the California Supreme Court was not an unreasonable

application of clearly established Supreme Court authority.  Accordingly, this claim should be

denied.

E.  Unconstitutional Sentence

The California Supreme Court denied this claim without comment or citation.

Respondent's Exhibit 12.

Petitioner argues that the trial court violated his Sixth and Fourteenth Amendment

rights by sentencing him to six consecutive life sentences of 25 years to life based on facts not

proved to a jury beyond a reasonable doubt.  In support of this claim, petitioner cites Apprendi v.

New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), Blakely v. Washington, 542 U.S. 296, 124 S.

Ct. 2531 (2004) and Cunningham v. California, 549 U.S. 270, 127 S. Ct. 856 (2007).

Neither <u>Cunningham</u>, nor its foundational cases, apply to consecutive sentencing

for multiple offenses.  <u>Oregon v. Ice</u>, __U.S.__, 129 S.Ct. 711 (2009).   Accordingly, this claim is

without merit.

F.   <u>Improper Denial of Motion for Substitute Counsel</u>

In this claim (no. 9) petitioner raises two claims.  First, he alleges that he was

denied his right to counsel at a critical stage.  Second, he alleges that the trial court improperly

denied his motion for substitute counsel.  The California Court of Appeal issued a reasoned

opinion addressing these claims:

> Vaden also contends that the trial court erred in denying his posttrial Marsden
> motions, thus depriving him of his federal constitutional right to the effective
> assistance of counsel. (See U .S. Const., 6th Amend.) He challenges the trial
> court's denial of the motions filed immediately before his court trial on his prior
> conviction allegations and filed before sentencing. He argues that the trial court
> did not make sufficient inquiry into his reasons for claiming that his trial counsel
> was incompetent before it exercised its discretion to deny his requests to substitute
> counsel. Vaden contends that his conviction must be reversed, his case remanded
> for a full inquiry on his Marsden motions, and for a hearing on a motion for new
> trial based on a claim of ineffective assistance of counsel.
>
> A criminal defendant is entitled to competent representation-either retained or
> appointed-at all stages of trial, including presentation of a new trial motion and
> sentencing. ( People v. Smith (1993) 6 Cal.4th 684, 690, 695 ( Smith ).) The
> defendant has an absolute right to substitute appointed counsel if he or she can
> show that his or her constitutional right to counsel would otherwise be
> substantially impaired. ( People v. Nakahara (2003) 30 Cal.4th 705, 718; see
> Marsden, supra, 2 Cal .3d at p. 123.) The defendant establishes a substantial
> impairment of the right to counsel if the record clearly shows that counsel is not
> providing competent representation or that defendant and counsel are embroiled in
> such an irreconcilable conflict that ineffective representation is likely to result. (
> People v. Barnett (1998) 17 Cal.4th 1044, 1085, cert. den. sub nom. Barnett v.
> California (1998) 525 U.S. 1044.) On appeal, Vaden asserts that he established a
> prima facie case for ineffective assistance of counsel in both posttrial Marsden
> motions.
>
> When a defendant expresses a desire to discharge appointed counsel FN12 and
> substitute another attorney by making a Marsden motion, the trial court must
> conduct a hearing on the motion. ( People v. Barnett, supra, 17 Cal.4th at p. 1085.)
> It must hear the defendant's reasons for desiring substitution of appointed counsel,
> but once it has done so, the question of whether the defendant has established a
> substantial impairment of the right to counsel is left to the trial court's discretion. (
> Smith, supra, 6 Cal.4th at pp. 690-691; People v. Webster (1991) 54 Cal.3d 411,
> 435, cert. den. sub nom. Webster v. California (1992) 503 U.S. 1009; Marsden,
> supra, 2 Cal.3d at p. 123; see People v. Barnett, supra, 17 Cal.4th at p. 1085.)

18

FN12. Counsel was appointed for Vaden at arraignment. Six months later, new counsel was appointed for him at his request. The attorney appointed in October 2001 represented Vaden at trial in June 2002, at the August 2002 motion for new trial hearing, and at sentencing in August 2002.

On appeal, we review a trial court's denial of a Marsden motion for any abuse of discretion. A denial of a Marsden motion is an abuse of discretion only if the defendant showed that a failure to replace counsel would substantially impair his or her right to counsel. ( Smith, supra, 6 Cal.4th at pp. 690-691; see People v. Barnett, supra, 17 Cal.4th at p. 1085; People v. Webster, supra, 54 Cal.3d at p. 435; Marsden, supra, 2 Cal.3d at p. 123.) With these legal standards in mind, we consider the merits of each of Vaden's two challenges to the trial court's denials of his Marsden motions.

B. June 2002 Motion

The first of two Marsden motions that form the basis of Vaden's claim of error on appeal FN13 arose on June 28, 2002, immediately before trial of his prior convictions. Vaden filed a written motion seeking substitution of counsel, focusing on counsel's trial conduct. In it, he argued that trial counsel had been incompetent for failure to make critical objections, failure to present favorable evidence and witnesses on his behalf, and failure to present evidence rebutting an inaccurate portrayal of him suggested by the prosecution during Vaden's cross-examination. Vaden also sought new counsel in order to investigate other possible grounds of ineffective assistance of counsel that were not known to him.

FN13. In 2001, Vaden filed a Marsden motion to substitute counsel for another attorney and a motion for reconsideration of the trial court's initial denial of his first Marsden motion, but they did not relate to the conduct of his trial counsel.

The trial court reviewed his written motion, concluded that it was factually and legally inaccurate and characterized it as a complaint that his attorney failed to raise certain trial objections at trial. It noted that nothing in the motion discussed why trial counsel could not adequately represent Vaden at the present time-at the trial of his prior conviction allegations. Vaden did not address this issue in his written motion.

Despite this, the trial court conducted an in camera hearing on the motion. At the in camera hearing, Vaden complained that his attorney had been ineffective at trial for failing to subpoena two witnesses that could have testified on his behalf regarding the charges of which he was convicted. He said that one victim had been overheard saying that he had stolen drugs from Stith and that Vaden had nothing to do with the charged crimes. After listening to these complaints, the trial court explained that the focus of the trial had shifted to Vaden's prior convictions and invited him to comment on his counsel's ability to defend him against these allegations, to no avail. Vaden did not argue that his attorney was incompetent to represent him at the posttrial proceedings. The trial court explained that Vaden's ineffective assistance of counsel claim based on his attorney's trial conduct could be raised in a motion for new trial or on appeal, but that the issue before the court then was whether he was entitled to a new appointed attorney at this posttrial proceeding.

The trial court again invited Vaden to explain why he should have a new attorney for this part of the trial. Vaden replied that he did not feel that his attorney had his best interests at heart and that he believed that he had a conflict with members of his attorney's office. He argued that he was denied a fair trial by his attorney's failure to mention inconsistencies in the victims' testimony during closing argument, prompting the trial court to ask again why he was entitled to a new attorney at this later proceeding. The defendant stated that he had nothing to say on that subject. The trial court then denied Vaden's Marsden motion as lacking factual foundation, lacking legal support, and an untimely attempt to delay trial of his prior convictions.

In order to properly exercise its discretion to rule on a Marsden motion, the trial court must allow the defendant an opportunity to explain his or her reasons for desiring new counsel. It must listen to those reasons and consider any specific examples of counsel's inadequate representation that the defendant will enumerate. ( Smith, supra, 6 Cal.4th at p. 690; Marsden, supra, 2 Cal.3d 118, 123-124; People v. Munoz (1974) 41 Cal.App.3d 62, 65.) On appeal, Vaden contends that the trial court erred by denying his June 2002 Marsden motion because it failed to make necessary inquiries before it ruled on the motion. In support of his argument, he relies in his opening brief on People v. Kelley (1997) 52 Cal.App.4th 568, arguing that the appellate court in that case reversed the denial of a Marsden motion for failure to make such inquiries.

Our reading of Kelley does not support his claim that this case is similar to his own situation. In Kelley, the defendant filed a motion for new trial alleging ineffective assistance of counsel. As the motion did not ask for substitution of appointed counsel, the trial court did not conduct a Marsden hearing on it. The appellate court held that even without a specific request for new counsel, the motion triggered a duty on the part of the trial court to conduct a Marsden hearing. ( People v. Kelley, supra, 52 Cal.App.4th at pp. 579-580.)

Kelley differs in its procedural posture and with regard to the legal issue presented on appeal by Vaden on his June 2002 motion. Unlike the defendant in Kelley, Vaden made an express Marsden motion requesting appointment of new counsel. No question arose about whether the trial court was obligated to hold a Marsden hearing on his June 2002 motion. The trial court did hold a hearing. The issue in Vaden's case is not the one present in Kelley, whether the trial court was required to hold a hearing. Instead, the issue is whether the inquiry that the trial court did make at the June 2002 Marsden hearing was sufficient to allow it to exercise its discretion when ruling on whether substitution of counsel was necessary in order to protect Vaden's constitutional right to the effective assistance counsel. On this point, Vaden cites no relevant authority in his opening brief.

In his reply brief, Vaden argues that Smith, supra, 6 Cal.4th 684 also supports his claim of error. In that case, our Supreme Court held that a trial court's inquiry into an ineffective assistance of counsel claim is forward-looking in the sense that counsel would be substituted to provide effective assistance at the motion for new trial and sentencing stages of the criminal proceeding, but the trial court's decision is necessarily based on what has occurred in the past. ( Id. at p. 695.) Vaden reasons that Smith required the trial court to inquire into his claim that counsel was ineffective at trial in order to determine whether the same attorney would be

ineffective after trial of the charges against him-during the bifurcated trial of his prior conviction allegations, on a motion for new trial, and at sentencing. However, the record on appeal shows that the trial court did make such an inquiry when it asked Vaden to explain what about trial counsel's representation-that is, his past performance at trial-made him believe that he was entitled to new counsel at future parts of the criminal proceeding. When the inquiry was made, Vaden failed to offer any connection between counsel's past performance with his claim that he would be incompetent in the future. On this record, we are satisfied that the trial court made a sufficient inquiry into Vaden's reasons for his June 2002 Marsden motion.

C. August 2002 Motion

On August 27, 2002, Vaden appeared on his motion for new trial FN14 and for sentencing. He again moved to relieve his trial counsel as his attorney on ineffective assistance of counsel grounds. His written motion filed with the trial court raised a series of complaints about his representation before and during trial. Specifically, he argued that trial counsel failed to adequately investigate his case by finding witnesses who would bolster his defense or challenge the prosecution's evidence; failed to present evidence of his impaired mental state due to intoxication; failed to use evidence challenging one victim's ability to perceive events correctly; failed to collect exculpatory evidence; was not prepared to go to trial; had forgotten key aspects of the defense; failed to investigate an allegation of jury misconduct in a timely manner; failed to investigate the possibility of disqualifying the trial judge for bias; and later failed to disqualify the trial judge.

FN14. The motion for new trial argued that there was insufficient evidence to support the verdict, that the trial court erroneously excluded evidence of cell phone use, the prosecutor conducted improper cross-examination, and the prosecutor improperly communicated with a trial juror during trial. There was no ineffective assistance of counsel claim.

Again, the trial court conducted an in camera hearing on the Marsden motion. At the in camera hearing, Vaden raised several complaints about his trial counsel-failure to interview potential defense witnesses that he had sought to have counsel interview; attempting to give a copy of his Marsden motion to the prosecutor; failure to collect evidence of a 911 tape in time to defend against it; failure to obtain evidence that A.B. was intoxicated on drugs at the time of the incident; failure to argue during closing argument that Vaden was a victim rather than a perpetrator; failure to investigate his relationship with Stith in order to defend him; and failure to make a timely objection about possible juror misconduct. Considering that he was facing a very long prison term, Vaden did not feel that his trial attorney put in enough time on his case. He also stated that he felt misled because he believed that certain things would get done that his attorney did not do.

At this point, the trial court advised Vaden that while an ineffective assistance of counsel claim might be made on appeal, the focus of the motion before the court at that time was whether he needed new counsel to represent him at sentencing. Vaden replied that he needed a new attorney to investigate his trial counsel's competency before and during trial. He believed that there might be more issues

21

that could be raised in such a motion. He had nothing to add about the competency of his attorney to represent him at sentencing.

The trial court then invited defense counsel to comment on Vaden's objections. Trial counsel stated that Vaden had repeatedly asked him to assert an ineffective assistance of counsel claim in his motion for new trial, which the defense attorney did not feel that he was ineffective. He also told the trial court that he had advised Vaden to raise this issue directly with the court by a separate motion for new trial if he wanted to do so. Trial counsel admitted that he and Vaden had a conflict FN15 on this matter. The trial court stated its belief that the California Supreme Court had recently instructed trial courts not to appoint new counsel in such a situation, but to allow the defendant to raise the issue on appeal. Trial counsel opined that the trial court was correct on the law in this regard.

FN15. The California Supreme Court has noted that when an attorney's trial performance is being challenged, trial counsel has an inherent conflict of interest with the defendant making this challenge. ( Smith, supra, 6 Cal.4th at p. 692.) Vaden's trial counsel admitted as much during the second Marsden hearing. This potential conflict of interest is unavoidable. ( Id. at p. 694.)

Trial counsel also stated that he did not believe that an ineffective assistance of counsel claim existed, and the trial court noted that it was counsel's right to determine what motions should be filed on a defendant's behalf. Trial counsel offered to address the underlying matters that Vaden referred to if the trial court wished, but the trial court did not find that necessary. Instead, the trial court asked trial counsel to address whether he could properly represent Vaden at sentencing. Trial counsel saw no reason why he could not. He went on to note that in his preparation of the motion for new trial, Vaden wanted him to raise an additional issue-about whether the victims had violated the trial court's admonition not to discuss their testimony. Trial counsel investigated this claim, interviewed two potential witnesses, concluded on the basis of the evidence collected that Vaden's concern did not constitute an additional ground for a new trial, and advised Vaden that it would not be included in the motion for new trial.

Vaden again argued in favor of his Marsden motion, urging the trial court to appoint new counsel to allow investigation of evidence that might become stale with the passage of additional time. He also argued that it would be important to have new counsel to represent him in order to investigate these issues that he could raise on appeal. Based on the totality of the evidence presented, the trial court denied the Marsden motion to substitute counsel, concluding that these issues were best raised on appeal.

In his appellate challenge to the trial court's denial of this Marsden motion, Vaden again argues that the trial court was remiss in its duty to make sufficient inquiry into his reasons for this motion. When hearing a motion for new trial on grounds of ineffective assistance of counsel, the trial court must elicit and fully consider the defendant's reasons for believing that trial counsel was ineffective. In some circumstances, the trial court must do more than merely listen-it must also inquire into those reasons in order to be able to properly exercise its discretion. ( Smith, supra, 6 Cal.4th at p. 691; see People v. Munoz, supra, 41 Cal.App.3d at p. 66.) This inquiry may take the form of additional questioning of the defendant's

1   reasons about how counsel is not providing a competent defense. It may also
    require an inquiry into counsel's state of mind. (See, e.g., People v. Munoz, supra,
2   41 Cal.App.3d at p. 66.)

3   Even so, the August 2002 motion was not one for a new trial but for appointment
    of new counsel pursuant to Marsden. Focusing on the requirements of a Marsden
4   hearing, we note that the trial court made an even more complete inquiry at this
    Marsden hearing than it did at the June 2002 hearing. Not only did the trial court
5   ask Vaden to elaborate on his reasons for seeking new counsel at the then-current
    stage of the proceedings-which Vaden did not do-it also heard trial counsel
6   address the motion. This is not an instance of a trial court abusing its discretion in
    denying a Marsden motion after refusing a defendant's offer to relate specific
7   instances of misconduct. ( Marsden, supra, 2 Cal.3d at p. 124; People v. Munoz,
    supra, 41 Cal.App.3d at p. 65.)
8
    The California Supreme Court has cautioned trial courts to substitute counsel only
9   when necessary-that is, only when the record clearly shows that counsel is not
    providing competent representation or that the defendant and counsel are
10  embroiled in such an irreconcilable conflict that ineffective representation is likely
    to result. ( Smith, supra, 6 Cal.4th at p. 696; see People v. Barnett, supra, 17
11  Cal.4th at p. 1085 [substantial impairment standard].) The record before us does
    not establish substantial impairment of the right to counsel, nor a significant
12  likelihood that Vaden could have shown such an impairment if permitted new
    counsel at that stage of the proceedings. His complaints about trial counsel were
13  not linked to counsel's ability to represent him at sentencing. To the extent that
    Vaden sought new counsel in order to prepare a motion for new trial grounded in
14  ineffective assistance of counsel, trial counsel explained that he had considered
    this issue and had concluded that no such ground for new trial existed. The trial
15  court was entitled to resolve any dispute between Vaden and trial counsel by
    accepting the explanation offered by trial counsel. (See Smith, supra, 6 Cal.4th at
16  p. 696.)

17  On the issues that Vaden raised about ineffective assistance of counsel that went
    beyond those that the trial court could determine based on courtroom conduct, we
18  note that Vaden was not precluded from raising these issues in his own motion for
    new trial, in a petition for writ of habeas corpus, or in this appeal. He has not done
19  so by any means available to him, suggesting that there was no merit to his claim
    of ineffective assistance of counsel. Under these circumstances, we find that the
20  trial court made a sufficient inquiry into the grounds for Vaden's August 2002
    Marsden motion to enable it to properly exercise its discretion. (See Smith, supra,
21  6 Cal.4th at p. 690.) Thus, we find no basis for concluding that the trial court
    either failed to conduct proper Marsden inquiries or abused its discretion in
22  denying the motions to substitute counsel. (See, e.g., id. at p. 697.)

23  Respondent's Exhibit 6, pp. 10-18.

24          The court first considers whether the court properly denied petitioner's motion for

25  substitute counsel.  The denial of a motion to substitute counsel implicates a defendant's Sixth

26  Amendment right to counsel and is therefore a cognizable claim for federal habeas relief as "it is

                                              23

1    well established and clear that the Sixth Amendment requires on the record an appropriate

2    inquiry into the grounds for such a motion, and that the matter be resolved before the case goes

3    forward." Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir.2000) (en banc).

4              The ultimate question before the federal habeas court is whether the trial court's

5    denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in

6    that the conflict between [petitioner] and his attorney had become so great that it resulted in a

7    total lack of communication or other significant impediment that resulted in turn in an

8    attorney-client relationship that fell short of that required by the Sixth Amendment." Id. at 1026.

9    The Ninth Circuit has explained further that "[t]he test for determining whether the trial judge

10   should have granted a substitution motion is the same as the test for determining whether an

11   irreconcilable conflict existed." Daniels v. Woodford, 428 F.3d 1181, 1197 (9th Cir.2005) (citing

12   United States v. Moore, 159 F.3d 1154, 1159 n. 3 (9th Cir.1998)).  Thus, this Court must

13   consider: "(1) the extent of the conflict; (2) whether the trial judge made an appropriate inquiry

14   into the extent of the conflict; and (3) the timeliness of the motion to substitute counsel." Id. at

15   1197-1198 (citing Moore, 159 F.3d at 1158-1159).

16             In both motions for substitute counsel and at both hearings, petitioner complained

17   regarding counsel's investigation of his case and presentation of the defense.  Petitioner did not

18   claim that his conflict with counsel prevented them from communicating.  Petitioner did not

19   explain why he required new counsel for the hearing on the prior convictions or for sentencing.

20   In addition, this court found that petitioner's claims of ineffective assistance of counsel in the

21   instant petition which were also raised in his motion for substitute counsel, were without merit.

22   This court also observes that trial counsel raised the issue of jury misconduct – which petitioner

23   claimed he failed to adequately investigate in his motion for substitute counsel – in his motion

24   for a new trial.  Respondent's Exhibit 1, volumes 1-2, volume 1, p. 402.

25   /////

26   /////

1   Petitioner's complaints regarding counsel did not demonstrate the existence of an

2   "irreconcilable conflict" resulting in a total lack of communication.  That petitioner wanted new

3   counsel appointed to investigate trial counsel did not demonstrate the existence of a total

4   breakdown of the attorney-client relationship warranting substitution of counsel.  United States v.

5   Schaff, 948 F.2d 501, 505 (9th Cir. 1991) (defendant's attempt to fire his attorney did not

6   demonstrate a "total breakdown" of communication warranting substitution.)

7   Petitioner's claim that he was entitled to new counsel because trial counsel failed

8   to present an adequate defense did not show a total breakdown of communication warranting

9   new counsel.  Stenson v. Lambert, 504 F.3d 873, 886 (2007) ("Disagreements over strategical or

10  tactical decisions do not rise to the level of a complete breakdown of communication.") (citation

11  omitted); United States v. Shea, 493 F.3d 1110, 1119 (9th Cir.2007) (substitution not warranted

12  where disagreement was over tactics; "counsel's decision not to present a defense was tactical

13  and within her discretion"); United States v. McKenna, 327 F.3d 830, 844 (9th Cir.)

14  ("well-settled" that disputes between counsel and defendant about trial tactics are "not a

15  sufficient conflict to warrant substitution of counsel"), U.S. v. Franklin, 321 F.3d 1231,1238-39

16  (defendant failed to show "extensive conflict" with counsel, although defendant claimed counsel

17  failed to investigate, never responded to defendant's questions, and failed to act on information

18  provided by defendant); LaGrand v. Stewart, 133 F.3d 1253, 1276-77 (9th Cir.) (substitution of

19  counsel not warranted where record showed counsel and defendant communicated, although

20  defendant complained about inadequate time meeting with counsel and counsel's "gloomy

21  predictions").

22  The trial court's inquiry was adequate because it gave petitioner an opportunity to

23  address his conflict with counsel.  The trial court asked petitioner why he believed trial counsel

24  could not represent him at the hearing on his prior convictions and at sentencing.  The court did

25  not, for example, summarily deny the requests without an inquiry.

26  \\\\\

1          The first motion was made on the eve of the court trial regarding petitioner's prior

2    convictions.  Respondent's Exhibit 2, volumes 6-9, volume 8.  The trial court denied the first

3    motion as until untimely as an alternative ruling on the merits.  The second motion was made on

4    the eve of sentencing.  Id., volume 8.  The timing of these motions weighs strongly in favor of

5    the trial court's decision not to grant petitioner's request for new counsel.  United States v. Cassel,

6    408 F.3d 622, 638 (9th Cir.2005) (on direct appeal, finding no abuse of discretion and noting that

7    untimeliness of request for new counsel made on day of sentencing "weigh[s] heavily" in favor

8    of lower court's decision); see also United States v. Walters, 309 F.3d 589, 592 (9th Cir.2002)

9    (defendant's Sixth Amendment right to counsel is qualified by the need for "fair, efficient, and

10   orderly administration of justice.").

11         For the reasons discussed above, the court finds that the trial court properly denied

12   petitioner's motion for substitute counsel.

13         Petitioner argues that the trial court should have appointed counsel to investigate

14   and file a motion for a new trial based on his claims of ineffective assistance of trial counsel.

15   However, petitioner raised his ineffective assistance of counsel claims in his motions for

16   substitute counsel rather than in a motion for a new trial.  At the hearings on the motions for

17   substitute counsel, the trial court advised petitioner to raise these claims in a new trial motions.

18         Even had the trial court construed petitioner's motions for substitute counsel as

19   including new trial motions, petitioner's claim fails because no Supreme Court decision clearly

20   establishes that a state court must appoint substitute counsel whenever a motion for a new trial

21   rests upon the alleged incompetence of counsel.  See Jackson v. Ylst, 921 F.2d 882, 887-88 (9th

22   Cir.1990) (a requirement that the trial court appoint substitute counsel whenever an indigent

23   defendant seeks a new trial on the basis of counsel's incompetence would be a "new rule" under

24   Teague v. Lane, 489 U.S. 288 (1989)).  Because petitioner has not demonstrated that counsel

25   provided ineffective assistance, the court finds that petitioner has not shown that appointment of

26   substitute counsel to represent him in a new trial motion was warranted.

1    The denial of these claims by the California Court of Appeal was not an

2    unreasonable application of clearly established Supreme Court authority.  Accordingly, these

3    claims should be denied.

4         G.  Jury Instruction Error

5         *Legal Standard*

6         A challenge to jury instructions does not generally state a federal constitutional

7    claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

8    Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

9    interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475

10   (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

11   F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to

12   deciding whether a conviction violated the Constitution, laws, or treaties of the United States

13   (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in

14   the state trial proceedings to reach the level of a due process violation, the error had to be one

15   involving "fundamental fairness."  Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined

16   the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct.

17   at 482.

18        Where what is at issue is the failure to give an instruction, petitioner's burden is

19   "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

20   less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

21   155, 97 S. Ct. 1730, 1737 (1977).  Moreover, a trial judge need not instruct on a defense which

22   would be inconsistent with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240

23   (9th Cir. 1984).  Failure to give a jury instruction under these circumstances will not amount to a

24   due process violation.  Id.

25        The burden upon petitioner is greater yet in a situation where he claims that the

26   trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

1    duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

2    claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

3    Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

4    claim whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to

5    violate due process, the impact on the proceeding from failure to give an instruction sua sponte

6    must be of a very substantial magnitude.

7            Furthermore, the Supreme Court has recently held that there is no unreasonable

8    application of federal law where a state appellate court decided that a jury instruction's single

9    incorrect statement of the "imperfect self-defense" standard did not render the instruction

10   reasonably likely to have misled the jury.  Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830

11   (2004).

12           *Analysis*

13           The California Court of Appeal issued a reasoned opinion denying these claims.

14   Respondent's Exhibit 6, pp. 8-10, pp. 7-8.

15           Petitioner first argues that his right to due process was violated by the trial court's

16   failure to instruct the jury that it must find that petitioner personally premeditated and deliberated

17   the attempted murders.  The jury was instructed with CALJIC 8.67 which states, in relevant part,

18           To constitute willful, deliberate and premeditated attempted murder, the would-be
             slayer must weigh and consider the question of killing and the reasons for and
19           against such a choice and, having in mind the consequences, to kill and makes a
             direct but ineffectual act to kill another human being.
20

21   Respondent's Exhibit 1, volume 2, p. 350.  Petitioner argues that this instruction permitted the

22   jury to return a true finding as to the premeditation enhancement solely upon a finding that Stith

23   premeditated the murder.  See Cal. Penal Code 664(a) (sentence for attempted murder increased

24   to life in prison if the attempted murder is product of premeditation and deliberation).

25           Under California law, there is no requirement that a jury find that an aider and

26   abettor personally premeditated the attempted murder.  People v. Lee, 31 Cal.4th 613, 628, 629

                                                    28

1   (2003).  The attempt statute, Cal. Penal Code § 664(a), "... requires only that the murder

2   attempted was willful, deliberate, and premeditated, but not that an attempted murderer

3   personally have acted with willfulness, deliberation, and premeditation even if he or she is guilty

4   as an aider and abettor." Lee, 31 Cal.4th at p. 629, discussing People v. Laster, 52 Cal.App.4th

5   1450, 1473 (1997).  Therefore, petitioner's argument that CALJIC 8.67 misstated California law

6   is without merit.

7           Petitioner also argues that CALJIC 8.67 allowed him to be convicted as an aider

8   and abettor based on strict liability in violation of his right to due process.  This argument is

9   without merit because the Ninth Circuit has clearly held that an aider and abettor need not share

10  the specific intent of the perpetrator.  See Spivey v. Rocha, 194 F.3d 971, 976 (9th Cir. 1999).

11          Petitioner next argues that the trial court erred by failing to provide a cautionary

12  instruction regarding the admission into evidence of petitioner's extrajudicial statements.  The

13  California Court of Appeal denied this claim for the following reasons:

14          On appeal, Vaden first argues that the trial court erred when it failed to instruct
            the jury sua sponte to view evidence of an admission with caution. He contends
15          that the trial court thus violated his federal constitutional rights to a fair trial and
            due process. (See U.S. Const., 6th & 14th Amends.; see also CALJIC No. 2.71.)
16          At trial, the victims testified that Vaden threatened them by saying: (1) "If you
            don't ... tell me who [burglarized his home], this [is] going to turn into the shit you
17          see on [ sic ] the movies." (2) To Stith, "You shoot him, and then I'm going to
            shoot the other one." (3) "I'm gonna count to three, and then if you don't tell me,
18          you are gonna die." (4) After the shooting, "We gotta find him." On appeal,
            Vaden reasons that each of these statements constituted evidence of an admission
19          warranting a sua sponte cautionary instruction as set forth in CALJIC No. 2.71.

20          In this case, the trial court did not give CALJIC No. 2.71 FN10 but it did instruct
            the jury with CALJIC No. 2.71.7 at the People's request. The instruction given
21          advised the jury that evidence of a defendant's oral statement should be viewed
            with caution.FN11 As CALJIC No. 2.71.7 contains the admonition that Vaden
22          argues should have been given to the jury sua sponte, we conclude that the jury
            was adequately instructed on this issue. (See People v. Lang (1989) 49 Cal.3d
23          991, 1021, cert. den. sub nom. Lang v. California (1990) 498 U.S. 881.)

24          FN10. CALJIC No. 2.71 provides: "An admission is a statement made by [a][the]
            defendant which does not by itself acknowledge [his][her] guilt of the crime[s] for
25          which the defendant is on trial, but which statement tends to prove [his][her] guilt
            when considered with the rest of the evidence. [¶] You are the exclusive judges as
26          to whether the defendant made an admission, and if so, whether that statement is

                                              29

1    true in whole or in part. [¶] [Evidence of an oral admission of [a][the] defendant
     not made in court should be viewed with caution.]"

2

3    FN11. The jury was instructed that evidence had "been received from which you
     may find that an oral statement of motive was made by the defendant before the
     offense with which he is charged was committed. It is for you to decide whether
4    the statement was made by the defendant. Evidence of an oral statement ought to
     be viewed with caution."

5

6    Vaden argues that Lang is distinguishable because in that case, the jury was
     instructed by the broader CALJIC No. 2.71, not the more limited CALJIC No.
     2.71.7 that was given in this case. The scope of CALJIC No. 2.71.7 as given to
7    Vaden's jury was limited to preoffense statements of his motive. (See fn. 11, ante.)
     Three of the four express threats that he cites as warranting a sua sponte
8    cautionary jury instruction were reportedly made before the shooting and thus fall
     within the scope of CALJIC No. 2.71.7.

9

     As to the single statement reportedly made after the shooting, Vaden argues that
10   CALJIC No. 2.71.7 did not instruct the jury to view it with caution. Even if we
     assume arguendo that CALJIC No. 2.71 should have been given sua sponte with
11   regard to this final statement, we would find no prejudice in this case. A trial
     court's failure to give cautionary instructions is prejudicial only if it is reasonably
12   probable that the jury would have reached a result more favorable to the defendant
     if the instructions were given. ( People v. Carpenter (1997) 15 Cal.4th 312, 393,
13   cert. den. sub nom. Carpenter v. California (1998) 522 U.S. 1078; see People v.
     Watson (1956) 46 Cal.2d 818, 836, cert. den. sub nom. Watson v. Teets (1957)
14   355 U.S. 846.) The statement that he and Stith had to find the victims after the
     shooting contained an implied threat, making it a less forceful admission than the
15   three preoffense express threats. As the jury found against Vaden on the issue of
     whether he expressly threatened A.B. and D.R. before the shooting after having
16   been advised to view this evidence with caution pursuant to CALJIC No. 2.71.7,
     we are satisfied that it is not reasonably probable that the same jury would have
17   rendered a different verdict if it had been similarly instructed with regard to his
     single postoffense implied threat.

18

19   Respondent's Exhibit 6, pp. 7-8.

20            Based on the reasoning of the California Court of Appeal, the court finds that the

21   trial court's failure to read CALJIC 2.71.7 did not violate fundamental fairness.  CALJIC 2.71

22    adequately advised the jury that petitioner's pre-offense statements should be viewed with

23   caution.  While CALJIC 2.71 did not cover petitioner's post-offense statement, admission of this

24   statement without the cautionary instruction did not violate fundamental fairness.  As noted by

25   the state appellate court, petitioner's post-offense statement that he and Stith had to find the

26   victims was a less forceful omission than the three pre-offense admissions.  It is unlikely that the

                                            30

1  jury would have rendered a different verdict had it been similarly instructed regarding this post-

2  offense implied threat.

3        The denial of these claims by the California Court of Appeal was not an

4  unreasonable application of clearly established Supreme Court authority.  Accordingly, these

5  claims should be denied.

6        H.  Cumulative Error

7        The California Supreme Court denied this claim without comment or citation.

8  Respondent's Exhibit 12.

9        Petitioner argues that he is entitled to habeas relief based on cumulative error.

10  "Cumulative error applies where, 'although no single trial error examined in isolation is

11  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

12  prejudice a defendant.'" Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002), quoting United

13  States v. Frederick, 78 F.3d 1370, 1381 (9th Cir.1996).  In the instant case, "[b]ecause there is no

14  single constitutional error in this case, there is nothing to accumulate to a level of a constitutional

15  violation."  Id.

16        The denial of this claim by the California Supreme Court was not an unreasonable

17  application of clearly established Supreme Court authority.  Accordingly, this claim should be

18  denied.

19        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

20  writ of habeas corpus be denied.

21        These findings and recommendations are submitted to the United States District

22  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

23  days after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26  shall be served and filed within ten days after service of the objections.  The parties are advised

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: 08/17/09

4                                 /s/ Gregory G. Hollows

5                                 UNITED STATES MAGISTRATE JUDGE

6

7

8   vad1733.157

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26